

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| YI MEI KE, *on behalf of herself and others similarly situated*, |
| Plaintiff, |
| -against- |
| JR SUSHI 2 INC., et al., |
| Defendants. |

19-CV-7332 (PAE) (BCM)

**MEMORANDUM AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Yi Mei Ke was employed as a "miscellaneous kitchen helper and cook" at the JR Sushi 2 restaurant (JR Sushi), located at 86A West Broadway in Manhattan. According to plaintiff, "[m]ore or less the same group of individuals" owns and operates JR Sushi and another restaurant, known as Famous Sichuan, located nearby at 10 Pell Street in Manhattan. Ke Aff. (Dkt. No. 70-5) ¶ 4. In this action, brought on behalf of herself and others similarly situated, plaintiff sues Yukwah Kwok Cheng, Kai Tuan Wang, Xin Wang, Ruifeng Yang,[1] Zi Wang,[2] and Henry Zhang (collectively the Individual Defendants), as well as JR Sushi 2 Inc. and Famous Sichuan New York Inc. (collectively the Corporate Defendants), alleging that all defendants violated the minimum wage and overtime provisions of the Fair Labor Standards Act (FLSA), *see* 29 U.S.C. §§ 206, 207(a), as well as the minimum wage, overtime, spread-of-hours, wage notice, and wage statement provisions of the New York Labor Law (NYLL) and its implementing regulations. *See* NYLL §§ 195(1), 195(3), 232, 652; 12 N.Y.C.R.R. §§ 142-2.2, 142-2.4, 142-2.7, 142-2.18.

---

[1] Sued as "Rui Yang a/k/a Ruifeng Yang a/k/a Rui Feng Yang a/k/a Jane Doe," this defendant spells her name Ruifeng Yang. *See*, *e.g.*, Yang Decl. (Dkt. No. 76-4). The Court will follow suit.

[2] Sued as "Zinn Wang a/k/a Zi Wang a/k/a John Doe," this defendant spells his name Zi Wang. *See*, *e.g.*, Zi Wang Decl. (Dkt. No. 76-5). The Court will follow suit.

Now before the Court is plaintiff's motion for an order: (1) granting conditional certification of her FLSA claims as a collective action, pursuant to 29 U.S.C. § 216(b), on behalf of all non-managerial, non-exempt employees at JR Sushi and Famous Sichuan from August 6, 2016 (three years before plaintiff filed this action) to the present; (2) directing defendants to provide the names, last known addresses, telephone numbers, email addresses, and social media usernames of all potential collective members, together with information about where, when, and in what positions they worked for defendants; (3) approving plaintiff's proposed notice and consent form; (4) permitting plaintiff's counsel to disseminate the notice, in English and Chinese, via mail, email, text message, and/or social media, and to post it on counsel's website, and directing defendants to post it in their restaurants and include it in the pay envelopes of potential members of the collective; (5) setting a 90 day opt-in period; and (6) tolling the statute of limitations "for 90 days until the expiration of the Opt-In period." *See* Pl. Mot. (Dkt. No. 69) at 1-2; Pl. Mem. (Dkt. No. 71) at 12-24.

The motion is "within the scope of my authority under 28 U.S.C. § 636(b)(1)(A)." *Sanchez v. Salsa Con Fuego, Inc.*, 2016 WL 4533574, at *1 (S.D.N.Y. Aug. 24, 2016) (Moses, M.J.) (quoting *Nahar v. Dozen Bagels Co. Inc.*, 2015 WL 6207076, at *1 (S.D.N.Y. Oct. 20, 2015)); *see also Warman v. Am. Nat'l Standards Inst.*, 2016 WL 3647604, at *1 n.1 (S.D.N.Y. June 27, 2016) ("Motions for conditional certification of a collective action under the FLSA are non-dispositive.").

For the reasons set forth below, plaintiff's motion will be granted in part.

## I.    BACKGROUND

### A.    Factual Background

Except where otherwise indicated, the facts in this section are taken from plaintiff's Amended Complaint (Am. Compl.) (Dkt. No. 27) and the declarations submitted in support of and in opposition to plaintiff's motion.[3] Plaintiff was employed as a "miscellaneous kitchen helper and cook" at JR Sushi from January 6, 2017 through August 10, 2019. Ke Aff. ¶ 3; Second Ke Aff. (Dkt. No. 87) ¶ 1.[4] She does not claim to have worked at Famous Sichuan. From January 6, 2017 through March 31, 2017, Ke worked six days a week at JR Sushi, from 11:00 a.m. to 11:00 p.m. Am. Compl. ¶ 67; Ke Aff. ¶ 8. From April 1, 2017 through December 31, 2018, she worked seven days a week, from 11:00 a.m. to 11:00 p.m. on Sundays through Fridays, and from 4:00 p.m. to 11:00 p.m. on Saturdays. Am. Compl. ¶ 68; Ke Aff. ¶ 9. From January 1, 2019 through August 10, 2019 (her last day of employment at JR Sushi), plaintiff worked seven days a week, from 10:00 a.m. to 10:00 p.m. on Sundays through Fridays, and from

---

[3] At the conditional certification stage, courts "should not weigh the merits of the underlying claims," *Hamadou v. Hess Corp.*, 915 F. Supp. 2d 651, 662 (S.D.N.Y. 2013) (citing *Lynch v. United Servs. Auto Ass'n*, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007)), and should not "resolve factual disputes, decide substantial issues going to the ultimate merits, or make credibility determinations." *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 158 (S.D.N.Y. 2014) (internal quotation marks omitted). Accordingly, where there is a conflict between the parties as to the merits of plaintiff's wage and hour claims, I treat the facts asserted by plaintiff as true. *See Cortes v. New Creators, Inc.*, 2015 WL 7076009, at *1 n.1 (S.D.N.Y. Nov. 12, 2015).

[4] In her original Complaint (Dkt. No. 1), filed on August 6, 2019, plaintiff alleged that she was employed at JR Sushi from "on or about December 28, 2016, to the present." Compl. ¶ 31. In her Amended Complaint, filed on February 12, 2020, she alleged that she "continue[d] to be employed" at JR Sushi. Am. Compl. ¶¶ 65, 67. In her affidavits, however, plaintiff states that her employment began on January 6, 2017 (one week later than the date alleged in the Complaint) and ended on August 10, 2019 (a few days after she filed her Complaint). Ke Aff. ¶ 3; Second Ke Aff. ¶ 1. In a reply brief, she explains that the allegation in the Amended Complaint as to her continued employment at JR Sushi was accidentally carried over from her initial Complaint. Pl. Reply Mem./Famous Sichuan (Dkt. No. 88) at 3-4.

4:00 p.m. to 11:00 p.m. on Saturdays. Am. Compl. ¶ 69; Ke Aff. ¶ 10. She did not receive fixed meal breaks, "but ate a single meal, lunch, when [she] could." Ke Aff. ¶ 12.

Throughout her employment at JR Sushi, plaintiff was paid a flat monthly wage, in cash. Am. Compl. ¶ 73; Ke Aff. ¶¶ 13-18. In January 2017, that monthly wage was $1,800. Am. Compl. ¶ 73; Ke Aff. ¶ 13. Over the course of her employment plaintiff received several incremental raises, such that by July 2019 – and until the end of her employment on August 6, 2019 – her monthly wage was $2,100. Am. Compl. ¶ 73; Ke Aff. ¶ 16. Plaintiff was never notified, and did not agree, that her flat monthly compensation would include time-and-a-half pay for overtime work. Am. Compl. ¶¶ 75-77; Ke Aff. ¶¶ 20-21.

Plaintiff alleges that five of the Individual Defendants – Yukwah Kwok Cheng, Ruifeng Yang, her husband Kai Tuan Wang, their daughter Xin Wang, and their son Zi Wang – own and/or operate JR Sushi. Am. Compl. ¶¶ 24-43. These defendants "had the power to hire and fire employees of, supervised and controlled employee work schedules and conditions of employment at, determined employee rates and methods of payment at, and kept and maintained employee records" for JR Sushi. ¶¶ 24, 26, 30, 34, 40. Two of the Individual Defendants – Ruifeng Yang and her brother-in-law Henry Zhang – are alleged to own and/or operate Famous Sichuan *Id*. ¶¶ 34-39, 44-47. These defendants "had the power to hire and fire employees of, supervised and controlled employee work schedules and conditions of employment at, determined employee rates and methods of payment at, and kept and maintained employee records" for Famous Sichuan. *Id.* ¶¶ 34, 44.

More specifically, plaintiff alleges that defendant Ruifeng Yang (known to plaintiff as "Lady Boss") was the "sole listed shareholder" of JR Sushi 2 Inc., was a "partial listed shareholder" of Famous Sichuan New York Inc., and was the Alcoholic Beverage Control

principal for both Corporate Defendants. Am. Compl. ¶¶ 34-38. Her husband Kai Tuan Wang (known to plaintiff as "Boss") worked as "the general on-site manager" of JR Sushi during certain hours. *Id.* ¶¶ 26-27. Their daughter Xin Wang allegedly "had the authority to set and change the prices of menu items." *Id.* ¶¶ 31-32. Their son Zi Wang acted as another "on-site manager" of JR Sushi during certain hours. *Id.* ¶¶ 41-42. Defendant Henry Zhang, a brother of Kai Tuan Wang, was a "partial listed shareholder" of Famous Sichuan New York Inc. *Id.* ¶¶ 45-46. No additional details are provided regarding the role of Yukwah Kwok Cheng at either restaurant.

Plaintiff alleges that defendants' failure to pay the minimum wages and overtime premiums required by the FLSA and state law was willful. Am. Compl. ¶¶ 93, 100-01, 105. With respect to the FLSA claims that are the subject of the motion now before the Court, plaintiff alleges that defendants had (and continue to have) a policy and practice of: (1) "refusing to pay Plaintiff, and the similarly situated Collective Members, at least the minimum wage for some or all of the hours they worked" and (2) "refusing to pay overtime compensation at the statutory rate of time and a half to Plaintiff and Collective Members for all hours worked in excess of 40 hours per workweek," in violation of 29 U.S.C. § 207(a)(1) and § 215(a). *Id.* ¶¶ 91, 98.[5]

---

[5] At all times relevant to this action the federal minimum wage, pursuant to the FLSA, was $7.25 per hour. 29 U.S.C. § 206. Additionally, the FLSA generally requires employers to compensate employees for hours worked in excess of forty hours a week at a rate of one and one-half times the regular rate at which the individual is employed. 29 U.S.C. § 207(a). Thus, if Ke's allegations regarding her hours and wages are correct, both FLSA provisions were violated. By way of example: Ke claims to have worked 72 hours per week from the start of her employment through March 17, 2017. Am. Compl. ¶ 67; Ke Aff. ¶ 8. At the federal minimum wage, Ke should have been paid at least $7.25 per hour for the first 40 hours and $10.88 for the remaining 32 overtime hours, for a total (assuming no unpaid absences) of $638 per week, or $2,765 per month ($638 × 52 ÷ 12). During the same period, however, Ke alleges that she was paid no more than $1,900 per month. Am. Compl. ¶ 73; Ke Aff. ¶¶ 13-14.

### B.    Procedural Background

Plaintiff filed this action on August 6, 2019. The next day, it was referred to me for general pretrial management. (Dkt. No. 5.) On February 12, 2020, plaintiff filed her Amended Complaint. On March 13, 2020, defendants JR Sushi 2 Inc., Kai Tuan Wang, and Xin Wang (the JR Sushi Defendants) filed an answer. (Dkt. No. 49.) On May 6, 2020, defendants Famous Sichuan New York Inc., Ruifeng Yang, and Zi Wang (the Famous Sichuan Defendants), represented by different counsel, filed a separate answer. (Dkt. No. 58.)[6]

On June 3, 2020, plaintiff filed her motion for conditional collective certification, accompanied by her memorandum of law, her first affidavit, and a proposed notice and consent-to-sue form (Notice) (Dkt. No. 70-3). On June 23, 2020, the JR Sushi Defendants filed a brief in opposition to the collective certification motion (JR Sushi Mem.) (Dkt. No. 73), along with a declaration signed by defendant Kai Tuan Wang, who identifies himself as "a manager" of JR Sushi. Kai Tung Wang Decl. (Dkt. No. 72) ¶ 1.[7] On June 24, 2020, the Famous Sichuan Defendants filed a cross-motion for summary judgment (Dkt. No. 74), arguing that none of them was plaintiff's "employer" as that term is used in the FLSA, together with a single brief in opposition to the collective certification motion and in support of the cross-motion (Famous Sichuan Mem.) (Dkt. No. 75), the declaration of defendant Ruifeng Yang, who identifies herself as the "nominal owner" of JR Sushi 2 Inc. and the "owner/operator" of Famous Sichuan New York Inc., Yang Decl. ¶ 2, and the declaration of Zi Wang, who attests that he had no ownership interest in or managerial role at either restaurant. Zi Wang Decl. ¶ 8.

---

[6] Defendants Yukwah Kwok Cheng and Henry Zhang never answered the complaint or otherwise appeared in this action.

[7] Defendant Zinn Wang, one of the JR Sushi Defendants, did not submit a declaration.

On June 30, 2020, plaintiff filed her reply to the JR Sushi Defendants' opposition (Pl. Reply Mem./JR Sushi) (Dkt. No. 79), accompanied by her second affidavit. On July 8, 2020, she filed her reply to the Famous Sichuan Defendants' opposition and – separately – a brief in opposition to the Famous Sichuan Defendants' summary judgment motion (Pl. Opp. Mem./SJ) (Dkt. No. 85). On July 23, 2020, the Famous Sichuan Defendants filed a reply brief in further support of their motion for summary judgment (Famous Sichuan Reply Mem.) (Dkt. No. 89).

## II.   DISCUSSION

### A.   Legal Standards

The FLSA provides that "any one or more employees" may bring an action against an employer "for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). To become parties to such an action, employees other than the named plaintiff(s) must "opt in" by filing written consents in the court in which the action is brought. *Id.* "Although they are not required to do so by FLSA, district courts 'have discretion, in appropriate cases, to implement [§ 216(b)] . . . by facilitating notice to potential plaintiffs' of the pendency of the action and of their opportunity to opt-in as represented plaintiffs." *Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010) (quoting *Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989)).

Courts in this Circuit apply a "sensible" two-step method for determining whether to exercise this discretion. *See Myers*, 624 F.3d at 554-55. In the first step – known as "conditional certification" – the named plaintiff must make a "'modest factual showing' that [she] and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law,'" *id.* at 555 (quoting *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997)), at which point the trial court may send a notice to potential opt-in plaintiffs. *Id.* At the second stage,

which typically occurs after discovery has been completed, the court determines whether the plaintiffs who opted in are in fact "similarly situated" to the named plaintiffs. *Id*. If not, the court may "de-certif[y]" the collective action and dismiss the opt-in plaintiffs' claims without prejudice. *Id*. During the initial "conditional certification" stage, the requirement of a "modest factual showing" cannot be satisfied solely by "unsupported assertions." *Myers*, 624 F.3d at 555. However, because the purpose of this first stage is "merely to determine *whether* 'similarly situated' plaintiffs do in fact exist," plaintiffs have a low burden of proof. *Id.* (emphasis in original); *accord Damassia v. Duane Reade, Inc.*, 2006 WL 2853971, at *3 (S.D.N.Y. Oct. 5, 2006) (quoting *Wraga v. Marble Lite, Inc.*, 2006 WL 2443554, at *1-2 (E.D.N.Y. Aug. 22, 2006)) ("[A] plaintiff's burden at this preliminary stage is 'minimal.'"). A showing that plaintiffs "were subjected to certain wage and hour practices at the defendants' workplace and to the best of their knowledge, and on the basis of their observations, their experience was shared by members of the proposed class" is a sufficient basis from which to infer the "common policy" required for conditional certification at this stage. *Cortes*, 2015 WL 7076009, at *3 (citing *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 368 (S.D.N.Y. 2007)). Documents properly considered in this inquiry "include plaintiffs' 'own pleadings, affidavits, declarations, or the affidavits and declarations of other potential class members.'" *Trinidad v. Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d 545, 557-58 (S.D.N.Y. 2013) (quoting *Hamadou*, 915 F. Supp. 2d at 661). In an appropriate case, conditional collective certification may be based solely on the personal observations of one plaintiff. *See Hernandez v. Bare Burger Dio Inc.*, 2013 WL 3199292, at *3 (S.D.N.Y. June 25, 2013) (granting conditional collective action certification of all tipped employees at a single Bareburger location based on one employee's declaration).

In cases involving employees at multiple business locations, "courts consider whether the plaintiffs have made an adequate factual showing to support an inference that . . . a uniform policy or practice exists, and whether the locations share common ownership or management." *Trinidad*, 962 F. Supp. 2d at 558 (quoting *Hamadou*, 915 F. Supp. 2d at 662). Both prongs of the test must be met; thus, even when locations or businesses share common ownership or management, a plaintiff seeking conditional collective certification must present sufficient facts to support an inference of a common policy across all locations or businesses. *See id.* at 559-60 (declining to authorize notice to all Pret a Manger restaurant locations in New York City, or even to the full list of locations at which the named plaintiffs had worked, where they failed to allege sufficient facts "supporting an inference of a common policy" spanning those stores and their testimony described certain inconsistent practices across stores); *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 356 (E.D.N.Y. 2008) (conditionally certifying a group of employees at one pizza store, but declining to include employees at five other stores in the same chain where plaintiffs made only "generalized allegations of wrongdoing" regarding one of the stores, supported by hearsay statements of questionable reliability); *cf. Morris v. Lettire Const., Corp.*, 896 F. Supp. 2d 265, 270–71 (S.D.N.Y. 2012) (plaintiffs' assertions that they received "purely 'straight time' pay in the same distinctive manner . . . no matter where they worked or who supervised them" supported "a reasonable inference that plaintiffs' experiences reflected a company-wide policy").

### B.    Plaintiff's Factual Showing

In her first affidavit, plaintiff attests that, while working at JR Sushi, she was paid a flat monthly salary of $1,800 in January 2017; $1,900 from February 2017 to about May 2017; $1,950 from about April 2017 to about June 2017; $2,000 from about July 2017 to about June

2019; and $2,100 from July 2019 to the end of her employment. Ke Aff. ¶¶ 13-16. Further, plaintiff asserts that she was never given notice nor did she agree that her "flat monthly rates would compensate [her] for a particular number of hours worked during the week" or would "include time-and-a-half pay for overtime work." *Id.* ¶¶ 19-21. She also states that she "did not receive fixed meal breaks." *Id.* ¶¶ 12, 18.

According to plaintiff, other workers at JR Sushi and Famous Sichuan "suffered from the same common employment practices of the Defendants: they were not paid at the FLSA required overtime rate for hours worked in excess of forty (40) in a given week; and they received compensation in a monthly lump sum at a rate that was below both the federal and state minimum wage rates." Ke Aff. ¶ 22. Plaintiff identifies fourteen such individuals, *id.* ¶¶ 23-149, as follows:

- Zhang Shi Fu ("Chef Zhang" in Mandarin), also known as Lao Da ("Head" in Mandarin), worked as a sushi bar chef at JR Sushi. Ke Aff. ¶¶ 23, 25. Zhang Shi Fu worked from 11:00 a.m. to 11:00 p.m. (with a one-hour break) six days a week throughout his employment. *Id.* ¶ 28. Zhang Shi Fu was paid a flat weekly wage of $900. *Id.* ¶ 29. Plaintiff was aware of Zhang Shi Fu's wages and hours because of a conversation she had with a waitress during which the waitress mentioned Zhang Shi Fu's wage and that "it is the highest among all the employees working at JR Sushi." *Id.* ¶¶ 30-32.

- Lao Er ("Second One" in Mandarin) also worked as a sushi bar chef at JR Sushi. Ke Aff. ¶¶ 33, 35. Lao Er worked from 11:00 a.m. to 11:00 p.m. (with a one-hour break) six days a week throughout his employment. *Id.* ¶ 38. Lao Er was paid a flat monthly wage of $2,800, which was later increased to $3,000 per month. *Id.* ¶ 39. Plaintiff was aware of Lao Er's wages because she observed her boss writing Lao Er's pay slips in the basement. *Id.* ¶ 40.

- A Jin, also known as Lao San ("Third One" in Mandarin), also worked as a sushi bar chef at JR Sushi. Ke Aff. ¶¶ 41, 43. A Jin worked from 11:00 a.m. to 11:00 p.m. (with a one-hour break) six days a week throughout his employment. *Id.* ¶ 46.[8] Plaintiff says that A Jin was paid a flat monthly wage between $2,400 and $2,600. *Id.* ¶ 47. Plaintiff learned about A Jin's wages and hours from a

---

[8] A Jin stopped working at the restaurant twice, but each time was rehired. Ke Aff. ¶ 45.

conversation the two had, though she cannot recall any details about the conversation. *Id.* ¶ 48.

- Hui Jun Wan, also known as Xiao Mei ("Young Sister"), worked as a waitress at JR Sushi. Ke Aff. ¶¶ 49, 51. Hui Jun Wan worked from 11:00 a.m. to 11:00 p.m. (with a one-hour break) five or six days a week. *Id.* ¶ 54. Hui Jun Wan was paid a flat monthly wage of around $3,000 to $3,100. *Id.* ¶ 55. Plaintiff learned about Hui Jun Wan's wages during a conversation the two had in 2016 while they were in the basement together on their lunch breaks. *Id.* ¶ 56.[9]

- Grace Ma, also known as Xiao Mei ("Young Sister" in Mandarin), also worked as a waitress at JR Sushi. Ke Aff. ¶¶ 59, 61. Grace Ma worked from 11:00 a.m. to 11:00 p.m. (with a one-hour break) six days a week. *Id.* ¶ 64. Grace Ma was paid a flat monthly wage of around $3,300. *Id.* ¶ 65. Plaintiff was aware of Grace Ma's wages during a conversation the two had during Grace Ma's lunch break. *Id.* ¶¶ 66-67.

- Li Shi Fu ("Chef Li") worked at JR Sushi for seven or eight months as a delivery driver. First Ke Aff. ¶¶ 68, 70, 72. Li Shi Fu worked from 11:00 a.m. to 11:00 p.m. six days a week. *Id.* ¶ 74. He was paid a flat monthly wage of $1,200. *Id.* ¶ 75. Plaintiff learned of Li Shi Fu's wages during a conversation the two had during his meal break. *Id.* ¶ 78.

- Wang Da Ge ("Big Brother Wang" in Mandarin) also worked as a delivery driver at JR Sushi. First Ke Aff. ¶¶ 81. Wang Da Ge worked from 11:00 a.m. to 11:00 p.m. six days a week. *Id.* ¶ 84. He was paid a flat monthly wage of $1,100. *Id.* ¶ 85. Plaintiff learned of Wang Da Ge's wages when he announced to all employees that he was getting paid $100 less than another delivery driver. *Id.* ¶ 86.

- You Li Shou, also known as Xiao Di or Mu Di ("Young Brother" in Mandarin), worked for about six months as a delivery driver at JR Sushi. Ke Aff. ¶¶ 87, 88. You Li Shou worked from 11:00 a.m. to 11:00 p.m. six days a week. *Id.* ¶ 92. He was paid a flat monthly wage of $1,100. *Id.* ¶ 94. Plaintiff learned of You Li Shou's wages during a conversation between the two in the basement while You Li Shou was on his meal break. *Id.* ¶ 95.

- Li Quan, also known as "Da Ge" ("Big Brother") or "Guang Lao Toe" ("Bald Old Guy"), also worked as a delivery driver for about six months at JR Sushi. Ke Aff. ¶¶ 96, 98, 100. He worked from 11:00 a.m. to 11:00 p.m. six days a week. *Id.* ¶ 101. He was paid a flat monthly wage of $1,100. *Id.* ¶ 103. Plaintiff learned of

---

[9] If this assertion is true, this conversation predates plaintiff's employment at JR Sushi.

Li Quan's wages during a conversation the two had during his meal break. *Id.* ¶ 104.

- Xiao Mei ("Young Sister" in Mandarin) worked as a packer at JR Sushi. Ke Aff. ¶¶ 106, 108. Xiao Mei worked from 11:00 a.m. to 11:00 p.m. six days a week. *Id.* ¶ 111. She was paid a flat monthly wage of between $2,500 and $2,700. *Id.* ¶ 113. Plaintiff learned of Xiao Mei's wages during a January 2017 conversation she had with Xiao Mei upstairs near the packing station where she worked. *Id.* ¶ 114.

- Huang Yi Ba, also known as Lao Huang ("Old Huang" in Mandarin), worked as kitchen staff at both JR Sushi and Famous Sichuan. Ke Aff. ¶ 117. He worked from 11:00 a.m. to 11:00 p.m. six days a week. *Id.* ¶ 120. He was paid a flat monthly wage around $1,800, which was later increased to $2,100. *Id.* ¶ 121. Plaintiff learned of Huang Yi Ba's compensation from a conversation the two had, during which Huang Yi Ba also told her that defendant Kai Tuan Wang "had tricked him" with respect to his wages and the conditions of his employment. *Id.* ¶ 122.

- Yi Zhong, also known as Xiao Di ("Young Brother" in Mandarin), worked as a part-time delivery person for both JR Sushi and Famous Sichuan. Ke Aff. ¶¶ 124, 126. Yi Zhong worked from 11:00 a.m. to 11:00 p.m. two or three days a week at Famous Sichuan and "occasionally" at JR Sushi. *Id.* ¶ 129. Yi Zhong "received the salary of the employee for whom he was substituting, plus tips." *Id.* ¶ 131. She learned this information from another deliveryman (whose name she cannot recall), who mentioned Yi Zhong's wages to her. *Id.*

- Zhang Guo Li worked as a delivery driver at both JR Sushi and Famous Sichuan. Ke Aff. ¶ 135. He worked from 11:00 a.m. to 11:00 p.m. (with an hour-long break) six days a week. *Id.* ¶ 138. He was paid a flat monthly wage of $1,200. *Id.* ¶ 139. Plaintiff became aware of Zhang Guo Li's wages because he "made the fact that he made $100 more than the other delivery drivers well known to [her] and other employees," and at one point, she overheard defendant Kai Tuan Wang confirm this to be the case. *Id.* ¶ 140. She also saw the boss writing his pay slips in the basement. *Id.* ¶ 141.

- Shi Fu ("Master" in Mandarin) worked as a delivery driver for a few months at both JR Sushi and Famous Sichuan. Ke Aff. ¶¶ 144, 146. Shi Fu worked from 10:00 a.m. to 11:00 p.m. (with a one-hour break) six days a week. *Id.* ¶ 148. He was paid a flat monthly wage of $1,100. *Id.* ¶ 149. However, plaintiff does not recall how she learned of Shi Fu's compensation, offering instead that her figures may be based "on the common rate of pay of delivery drivers at the restaurant, and the probability that if one driver was paid at a higher or lower rate, the matter likely would have become a topic of conversation amongst the other drivers." *Id.* ¶ 149.

12

### C.    Analysis

#### 1.  JR Sushi

To the extent the proposed collective consists of all non-managerial, non-exempt employees at JR Sushi, plaintiff's affidavit satisfies the "modest showing that is required of [plaintiffs] at this preliminary stage: they were subjected to certain wage and hour practices at the defendants' workplace and to the best of their knowledge, and on the basis of their observations, their experience was shared by members of the proposed class." *Iglesias-Mendoza*, 239 F.R.D. at 368; *Hernandez*, 2013 WL 3199292, at *3.

"There is a 'consensus in this district that where a plaintiff bases an assertion of a common policy on observations of coworkers or conversations with them, he must provide a minimum level of detail regarding the contents of those conversations or observations.'" *Racey v. Jay-Jay Cabaret, Inc.*, 2016 WL 3020933, at *4 (S.D.N.Y. May 23, 2016) (quoting *Reyes v. Nidaja, LLC*, 2015 WL 4622587, at *3 (S.D.N.Y. Aug. 3, 2015)). However, plaintiffs are not required to provide "the times and dates" of the conversations, so long as a court "'can fairly infer' that other [employees] 'labored under similar working conditions and thus suffered the same violations of the FLSA.'" *Id*. (quoting *Guzman v. Three Amigos SJL Inc.*, 117 F. Supp. 3d 516, 525 (S.D.N.Y. 2015)).

In this case, the Court may fairly so infer. As described above, plaintiff has submitted a sworn affidavit, asserting that she personally spoke with certain employees at JR Sushi about their compensation, overheard conversations about her coworkers' compensation, and/or witnessed the "boss" hand-writing their pay slips. As a result, plaintiff learned that a number of employees at JR Sushi other than herself – including kitchen staff, sushi chefs, waitresses, packers, and delivery persons – worked more than 40 hours per week and were compensated by

means of a flat monthly wage arrangement that violated the minimum wage and overtime provisions of the FLSA. Ke's affidavit includes details such as the names (and/or nicknames) of the coworkers, their physical descriptions, and the timing and circumstances of at least some of the conversations. *See Mei Rong Du v. Dingxiang Inc.*, 2020 WL 7404984, at *6 (S.D.N.Y. Dec. 17, 2020) (finding a similar sworn declaration, containing information learned from seven other employees, identified by name or nickname, about the wages they were paid and the hours they worked, sufficient to satisfy plaintiff's "modest showing"); *Cuaya v. VI Development Grp., LLC*, 2020 WL 5494371, at *5 (S.D.N.Y. Sept. 10, 2020) (conditionally certifying collective based on sworn declaration attesting that plaintiff had spoken with at least ten other employees about their wages and hours).

It is not necessarily problematic that plaintiff submits a single affidavit, which in turn relies in part on "hearsay allegations." *See* JR Sushi Mem. at 8. In this District, courts "routinely grant[] conditional collective certification based solely on the personal observations of one plaintiff's affidavit." *Hernandez*, 2013 WL 3199292, at *3 (collecting cases); *see also Cuaya*, 2020 WL 5494371, at *6; *Du*, 2020 WL 7404984, at *6. Moreover, at this preliminary stage, "courts regularly rely on plaintiffs' affidavits and hearsay statements in determining the propriety of sending notice." *Cuaya*, 2020 WL 5494371, at *6 (quoting *Salomon v. Adderley Indus., Inc.*, 847 F. Supp. 2d 561, 563 (S.D.N.Y. 2012)). Here, plaintiff has adequately described conversations with other employees of JR Sushi concerning their wages and has thereby satisfied her minimal burden of showing that she is "similarly situated" to other members of the proposed group, at least to the extent it consists of non-managerial employees at JR Sushi.

### 2. Famous Sichuan

To the extent the collective extends to workers at Famous Sichuan, more analysis is required. Plaintiff alleges that JR Sushi and Famous Sichuan constitute a single integrated enterprise. Am. Compl. ¶¶ 49-64. "When assessing whether distinct, but closely affiliated entities should be treated as a single employer for FLSA purposes, district courts in this circuit have applied the 'single integrated enterprise' test, which considers (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Uraga v. Amici 519 LLC*, 2018 WL 3579850, at *3 (S.D.N.Y. July 25, 2018) (quoting *Juarez v. 449 Rest., Inc.*, 29 F. Supp. 3d 363, 367 (S.D.N.Y. 2014)) (internal quotations omitted). Where, as here, a plaintiff invokes the "single integrated enterprise" doctrine to seek conditional certification of a collective including employees of different corporate entities, courts in the Second Circuit generally require that plaintiff to "provide[] sufficient factual information to support [her] allegation that Defendants are a single integrated enterprise." *Id.* at *4. Accordingly, plaintiff Ke must make at least a "modest showing" that defendants' restaurants not only "share common ownership" but "treat employees, equipment, and supplies interchangeably." *Lijun Geng v. Shu Han Ju Restaurant II Corp.*, 2019 WL 4493429, at *14 (S.D.N.Y. Sept. 9, 2019) (collecting cases); *accord Cuaya*, 2020 WL 5494371, at *8.

She must also "provide[] some indication," *Gomez*, 2017 WL 4326071, at *3, that each restaurant "had employees that were 'similarly situated' with regard to the allegedly unlawful overtime policies." *Trinidad*, 962 F. Supp. 2d at 557-60 (conditionally certifying a collective extending to six Pret a Manger stores rather than all 33 stores in New York City or even all ten stores at which one or more of the named plaintiffs worked); *see also Gomez*, 2017 WL 4326071, at *6-7 (conditionally certifying a collective as to two Kitchenette locations, but not as

15

to a third where plaintiff provided no evidence "that the specific policies he identifies . . . existed generally at all of the Kitchenette locations"); *Jing Fang Luo v. Panarium Kissena Inc.*, 2016 WL 11263668, at *9-10 (E.D.N.Y. Nov. 23, 2016) (conditionally certifying a collective extending to just three Fay Da Bakery locations where plaintiffs "have simply not provided the Court with enough specifics to meet even the modest burden that they face at this juncture" as to other locations and collecting cases), *report and recommendation adopted*, 2017 WL 1216571 (E.D.N.Y. Mar. 30, 2017).

Here, plaintiff has made the required "modest factual showing" to extend the collective to employees at both JR Sushi and Famous Sichuan. She has provided sufficient factual information to support her allegation that the Corporate Defendants – and the restaurants they operate – "share common ownership" and "treat employees, equipment, and supplies interchangeably." She has also shown, preliminarily, that non-exempt, non-managerial employees at both locations were subject to common compensation policies that violated the FLSA.

With respect to common ownership and management, plaintiff alleges that Ruifeng Yang ("Lady Boss") is the sole shareholder of JR Sushi 2 Inc. and a partial shareholder of Famous Sichuan New York Inc., Am. Compl. ¶ 36; Ke Aff ¶ 6, as well as the Alcoholic Beverage Control principal for both. Am. Compl. ¶ 35. She further alleges that Yang "had the power to fire and hire employees of, supervised and controlled employee work schedules and conditions of employment at, determined employee rates and methods of payment at, and kept and maintained employee records for" both JR Sushi and Famous Sichuan. *Id*. ¶ 34. According to plaintiff, Yang was "in charge of Famous Sichuan" and also supervised Kai Tuan Wang ("Boss"), who was "always present at JR Sushi," except after 11:00 p.m., when he "went to Famous Sichuan to help pack the deliveries." Second Ke Aff. ¶¶ 45, 51-53. Additionally, Yang "made hiring decisions"

and "hired many JR Sushi employees," including Huang Yi Ba, plaintiff's "substitute worker," and a packer named Bing Xue. *Id.* ¶¶ 46, 54-56. Plaintiff attests that Yang "monitored JR Sushi workers through four surveillance cameras connected to her cell phone," *Id.* ¶ 57, and states that on one occasion Yang called Hui Jun Wan, a waitress at JR Sushi, "and chafed at her for 'scaring away a customer.'" *Id.* ¶ 58.

In her own declaration, Ruifeng Yang agrees that she is the owner and operator of Famous Sichuan New York Inc. and the "nominal owner" of JR Sushi 2 Inc., but claims to have "no active role" in its day-to-day business, and asserts that her husband, Kai Tuan Wang, is the sole "individual responsible for managing JR Sushi," which is "separate and apart from" Famous Sichuan. Yang Decl. ¶¶ 2-7. Their son, Zi Wang, similarly attests that Ruifeng Yang has "no active role in the affairs, management, or day to day business" of JR Sushi, and that "[t]he individual responsible for managing the JR [Sushi] Restaurant is my father, Kai Tuan Wang." Zi Wang Decl. ¶ 7. None of the defendants addresses Yang's status as the Alcoholic Beverage Control principal for both Corporate Defendants. At best, these declarations raise "a factual issue that is inappropriate for resolution at this stage." *Juarez*, 29 F. Supp. 3d at 372; *see also Kim v. 511 E. 5th St., LLC*, 985 F. Supp. 2d 439, 446 (S.D.N.Y. 2013) ("[I]f the plaintiff's allegations are sufficient on their face to support conditional certification, a defendant may not defeat the plaintiff's motion by presenting conflicting factual assertions.").

Plaintiff has also offered factual support for the proposition that the two restaurants treat employees, equipment, and supplies interchangeably. She describes several individuals who worked at both restaurants, including Huang Yi Ba, who worked as kitchen staff at both restaurants (and who "brought ingredients and plastic bags over from Famous Sichuan"), and Yi Zhong, Zhang Guo Li, and Li Shi Fu, all of whom worked as delivery drivers for both

restaurants. Ke Aff ¶¶ 5, 126, 135; Second Ke Aff. ¶¶ 42-43, 49. Although the details provided for Yi Zhong and Li Shi Fu are quite bare, plaintiff does provide sufficient detail as to Huang Yi Ba and Zhang Guo Li, who, according to plaintiff, were paid flat monthly wages, just as she was, for their work at both restaurants. Ke Aff. ¶¶ 117, 121-23, 135, 139-41. Plaintiff further explains that "[w]orkers at JR Sushi were often assigned to carry out tasks for Famous Sichuan, as were the workers at Famous Sichuan assigned to carry out tasks for JR Sushi." Second Ke Aff. ¶ 39. For example, deliverymen Zhang Guo Li and Li Shi Fu, who were paid by JR Sushi, were "required to go over to Famous Sichuan to work there." *Id.* ¶ 41. Zhang Guo Li performed deliveries for Famous Sichuan when it was "having a high volume of orders." *Id.* ¶ 42. Li Shu Fu worked at JR Sushi until 11:00 p.m., and was then "required to work at Famous Sichuan until 3:00 before leaving for home." *Id.* ¶ 43. It was "Lady Boss" who asked Li Shu Fu to work at Famous Sichuan until 3:00 a.m. *Id.* ¶ 44.

More generally, plaintiff asserts that the two restaurants "share materials, including delivery bags and garbage bags," and "host combined employee team-building events," Ke Aff. ¶ 5, including a "New Year's party for the employees at both restaurants." Second Ke Aff. ¶ 59.

In light of plaintiff's minimal burden at this stage, the Court concludes that these assertions, taken together, suffice to suggest that the two restaurants were operated as a single integrated enterprise and permit the Court to infer that the allegedly unlawful pay policies at JR Sushi extended to Famous Sichuan. *See Cheng Chung Liang v. J.C. Broadway Rest., Inc.*, 2013 WL 2284882, at *1 (S.D.N.Y. May 23, 2013) (holding that plaintiff's testimony about pay practices at one location "provides adequate evidence to indicate that employees at other restaurants controlled by defendants may be similarly situated"); *see also Gomez*, 2017 WL 4326071, at *6 (conditionally certifying collective as to two Kitchenettes where plaintiff listed a

number of delivery persons he claims to have worked with at both locations, described his own experience at the second location, and averred that the restaurants shared branding and co-owners).

**D.    Production of Potential Opt-In Plaintiff Information**

Plaintiff requests that the Court direct defendants to produce an Excel spreadsheet containing contact information for the potential opt-in plaintiffs, including (but not limited to) their "last known mailing addresses, [last] known telephone numbers, last known email addresses, last known WhatsApp, WeChat and/or Facebook usernames, work location, dates of employment, and position." Pl. Mem. at 17.[10]

Courts in this Circuit "routinely grant . . . motions to compel production of the names and addresses of potentially similarly situated employees who may wish to 'opt-in' to a collective action" following conditional certification. *Anglada v. Linens 'N Things, Inc.*, 2007 WL 1552511, at *7 (S.D.N.Y. Apr. 26, 2007) (collecting cases), *report and recommendation adopted* (May 22, 2007). Likewise, courts "commonly grant" requests for production of mailing addresses and dates of employment for the potential opt-in plaintiffs. *Cortes*, 2015 WL 7076009, at *4.

While courts in this District vary in their willingness to order production of telephone numbers and email addresses, it is increasingly clear that this information permits a more efficient means of providing notice than first class mail. *See, e.g.*, *Diatta v. Iguana New York*

---

[10] Plaintiff requests this information for employees who worked for defendants from January 6, 2017, to the present. Pl. Mem. at 17. Elsewhere, however, she argues that the collective should include employees who worked for defendants from August 6, 2016 (three years before she filed her original Complaint) to the present. *Id*. at 22-23. The Court construes the reference to January 6, 2017 on page 17 as a typographical error.

*Ltd.*, 2016 WL 2865132, at *6 (S.D.N.Y. May 10, 2016) ("Courts routinely order discovery of names, addresses, and telephone numbers in FLSA actions."); *Racey*, 2016 WL 3020933, at *10 (ordering defendants to provide "a list of the names, addresses, telephone numbers, email addresses, and dates of employment for potential class members"); *Hernandez v. NGM Mgmt. Grp. LLC*, 2013 WL 5303766, at *5 (S.D.N.Y. Sept. 20, 2013) (ordering defendants to produce "a computer-readable list of the names, addresses, compensation rates, telephone numbers, and dates of employment" for all potential opt-in plaintiffs). For the same reason, courts in this District have in some cases ordered the production of the potential opt-in plaintiffs' social media information, including WhatsApp, WeChat, and Facebook usernames. *See Qiang Lu v. Purple Sushi Inc.*, 447 F. Supp. 3d 89, 97 (S.D.N.Y. 2020) (granting plaintiff's request for such information, despite "possible privacy concerns," because the court must consider "the possibility that some members may not have phone numbers or stable addresses"); *Ting Qui Qui v. Shanghai Cuisine Inc.*, 2019 WL 6002371, at *4 (S.D.N.Y. Nov. 14, 2019) (granting request for social media information); *Jian Wu v. Sushi Nomado of Manhattan, Inc.*, 2019 WL 3759126, at *12-13 (S.D.N.Y. July 25, 2019) (same).

On balance, this Court agrees with the *Qiang Lu* court that the provision of social media usernames can help ensure that notice of the collective action reaches all potential opt-in plaintiffs. 447 F. Supp. 3d at 97. Defendants will therefore be required to produce to plaintiff's counsel a spreadsheet (in Excel format if possible) containing the names, dates of employment, positions, last known mailing addresses, last known telephone numbers, last known email addresses, and last known WhatsApp, WeChat and/or Facebook usernames, of all current and former non-managerial, non-exempt workers employed at JR Sushi and/or Famous Sichuan on or after August 6, 2016.

### E.    Form, Method, and Timing of Notice

The next set of issues involves the form, method, and timing of the information to be sent to the potential opt-in plaintiffs. Plaintiff requests that the Court approve her proposed Notice – which, among other things, presumes that the collective will include workers employed at both restaurants on or after August 6, 2016, and gives those employees 90 days to "opt in" to this action. *See* Pl. Mem. at 21-22. Plaintiff further requests that the Court: (1) authorize plaintiff's counsel to disseminate the Notice via mail, email, text message or social media chat, and on counsel's website and social media groups, *id*. at 19-20; (2) require defendants to post the Notice in a conspicuous location in their restaurants and to include it in the employees' pay envelopes, *id*. at 20; (3) authorize plaintiff's counsel to send a reminder, via mail and email, to all individuals who have failed to respond approximately halfway through the notice period, *id*. at 21; and (4) require that "all notices or posts to employees' attention be in Chinese." *Id*. at 23.

The JR Sushi Defendants ask the Court to deny collective certification altogether because plaintiff "failed to provide sufficient evidence of a factual nexus which binds them [sic] to potential members of the collective." JR Sushi Mem. at 6. These defendants concede that Ke has provided "substantial examples of other employees who were allegedly not paid properly," *id*., but assert that the "contradictions and inconsistencies" between her Amended Complaint and her first affidavit indicate that she is "not credible" and that "her affidavit should be disregarded." *Id*. at 7. In fact, those "contradictions and inconsistencies" are relatively minor, and many are plausibly explained in Ke's second affidavit. Moreover, as noted above, when faced with a conditional certification motion the court should not "resolve factual disputes" or make "credibility determinations." *Jackson*, 298 F.R.D. at 158.

Alternatively, the JR Sushi Defendants urge the Court to limit the Notice to workers employed by the restaurants on or after August 6, 2017 (two years before plaintiff filed her original Complaint), arguing that "[p]laintiff has no standing to be representative for potential plaintiffs who might opt-in and whose employment period dated back to August 6, 2016, prior to the Plaintiff's commencement of her own employment." *Id*. at 11-12. This argument finds no support in the Second Circuit. It is also premature. Should other collective members opt in as plaintiffs, the Court can consider whether plaintiff Ke is an adequate representative of the group. *See Vargas v. HSBC Bank USA, N.A.*, 2012 WL 10235792, at *2 (S.D.N.Y. Aug. 9, 2012) (declining to reach the question of "Plaintiff's adequacy as a class or collective representative at this time, in light of the absence of any opt-in plaintiffs").

The Famous Sichuan Defendants echo the JR Sushi Defendants' arguments. Famous Sichuan Mem. at 11-20. In addition, the Famous Sichuan Defendants ask that they be excluded from the Notice entirely because, they contend, the two Corporate Defendants "do not constitute a joint enterprise." *Id.* at 14. At the conditional certification stage, however, Ke was only required to make a "modest showing" – which she has done – that defendants' restaurants shared common ownership and "treat[ed] employees, equipment, and supplies interchangeably." *Lijun Geng,* 2019 WL 4493429, at *14.

All defendants further object (or seek changes) to the content of the proposed Notice and/or to plaintiff's proposals for distributing it, arguing that: (1) plaintiff's counsel, Troy Law, PLLC (Troy Law), should disclose its fee arrangement with any prospective plaintiffs, including "the percentage of any recovery that would be paid as attorney fees from any recovery by opt-in Plaintiffs," and should also disclose information pertaining to "how costs will be handled in the event of a judgment against Plaintiff" and more precise detail as to "the costs and expense that

may be incurred in the lawsuit"; (2) the consent form should be sent to the Clerk of Court rather than to plaintiff's counsel; (3) the opt-in period should extend for 60 days rather than the requested 90 days; (4) plaintiff should not be authorized to publish the Notice in an abbreviated form "at Defendants' expense by social media and by publication in newspaper," even if "Defendants fail to furnish a complete Excel list or more than 20% of the notice be returned as undeliverable with no forwarding address to be published in English and Chinese"; and (5) the Notice should not be disseminated by electronic means, including by social media messages or on social media groups, nor should it be published on plaintiff's counsel's website. JR Sushi Mem. at 13-19; Famous Sichuan Mem. at 21-26. I address each point in turn.

### 1.    Content of Notice

"Neither the [FLSA] statute, nor the courts, specifically outline what form court-authorized notice should take, nor what provisions the notice should contain." *Lee v. ABC Carpet & Home*, 2008 WL 2073932, at *1 (S.D.N.Y. May 9, 2008). "Under the FLSA, the content of the notice is left to the court's discretion." *Delaney v. Geisha NYC, LLC*, 261 F.R.D. 55, 59 (S.D.N.Y. 2009); *accord Lopez v. JVA Indus., Inc.*, 2015 WL 5052575, at *4 (S.D.N.Y. Aug. 27, 2015) (noting that the FLSA "vests the district court with broad discretion" with respect to the notice of pending litigation to be provided to potential opt-in plaintiffs).

"The overarching policies of the FLSA's collective suit provisions require that the proposed notice provide 'accurate and timely notice concerning the pendency of the collective action, so that [potential plaintiffs] can make informed decisions about whether to participate.'" *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F. Supp. 2d 445, 450 (S.D.N.Y. 2011) (quoting *Fasanelli v. Heartland Brewery, Inc.*, 516 F. Supp. 2d 317, 323 (S.D.N.Y. 2007)). To that end, the notice generally should contain:

> a description of some or all of the following: (1) the purpose of the notice; (2) the nature of the lawsuit filed and the relief being sought; (3) the proposed class composition; (4) the legal effect of joining the lawsuit; (5) the fact that the court has not taken any position regarding the merits of the lawsuit; (6) how to join the lawsuit; (7) the purely voluntary nature of the decision and the legal effect of not joining the lawsuit; (8) the prohibition against retaliation; and (9) the relevant contact information for any inquiries.

*Salomon v. Adderley Indus., Inc.*, 847 F. Supp. 2d 561, 566 (S.D.N.Y. 2012). Courts in this District have also held that the notice should include a warning that opt-in plaintiffs may be required to provide information, appear for deposition, or testify in court. *See Salomon*, 847 F. Supp. 2d at 567 (modifying proposed notice to explain such a possibility).

Defendants are generally correct that the Notice should disclose the fee arrangement between Troy Law and any opt-in plaintiffs. *See Mendoza v. Ashiya Sushi 5, Inc.*, 2013 WL 5211839, at *8 (S.D.N.Y. Sept. 16, 2013) ("[i]ncluding such information allows potential plaintiffs to understand the details of the arrangement to which they would consent if they chose to opt into the collective action"); *Fasanelli*, 516 F. Supp. 2d at 324 ("Because the fee structure may impact [an] 'opt-in' Plaintiff's recovery, if any, notice of those agreements should be provided up front."). However, the Court will not require disclosure of the precise percentage or amount to be paid to Troy Law as attorney fees, because that figure cannot now be known. Under *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 206 (2d Cir. 2015), and *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 600 (2d Cir. 2020), this Court must approve any award of fees and costs as fair and reasonable. It would therefore be "premature to include that specific information on a Notice of Pendency." *Lianhua Weng v. Kung Fu Little Steamed Buns Ramen Inc.*, 2018 WL 1737726, at *6 (S.D.N.Y. Mar. 26, 2018).

Here, the proposed Notice states in general terms that, for any opt-in plaintiff who chooses to be represented by Troy Law, "their costs and fees will be paid out of any settlement or

money judgment Plaintiffs receive against Defendants," Notice at 4, and that counsel "will not receive any fee" if there is no settlement or money judgment. *Id.* The consent form appended to the Notice explains further that if there is a settlement or judgment, Troy Law "will petition the Court for reasonable attorneys' fees and expenses" and will "receive a proportion of any such gross settlement or judgment amount." *Id.* at 5. While not inaccurate, this language fails adequately to convey that, upon settlement, the Court will evaluate any request for fees and costs by plaintiffs' counsel and will approve such an award only after determining that it is fair and reasonable. Plaintiff shall add language to the Notice making this point clear. Likewise, although plaintiff need not add detail as to the specific costs and expenses that may be incurred in this litigation, the Court directs plaintiff to add language that adequately conveys how costs will be handled in the event of a judgment *against* plaintiff(s), as defendants request.

Defendants also request that the Notice be modified such that the consent form be sent to the Clerk of Court, rather than plaintiff's counsel. *See* JR Sushi. Mem. at 14; Famous Sichuan Mem. at 22. Although some courts in this Circuit "have found that sending consent forms to plaintiff's counsel implicitly discourages opt-in plaintiffs from retaining their own counsel," *Mariani v. OTG Mgmt., Inc.*, 2016 WL 11670735, at *6 (E.D.N.Y. Nov. 21, 2016) (collecting cases), courts have agreed that consent forms may be sent to plaintiff's counsel if the potential for discouragement is *de minimus*. *Id.* at *7. The potential for discouragement is *de minimus* where the notice includes explicit language that the opt-in plaintiffs may retain their own counsel. *Id.* (finding more than *de minimus* risk where proposed notice only stated "if you want your own attorney to represent you in this lawsuit . . . you will be responsible for paying that attorney's fees and expenses" and failed to include explicit language that opt-in plaintiffs may retain their own counsel). Here, the proposed Notice contains adequate language indicating that opt-in plaintiffs

may retain their own counsel: "You have the right to hire any attorney of your choice to represent you in this matter." Notice at 4. Because the risk of discouragement here is *de minimus*, the Notice need not be modified, and the consent forms may be returned to plaintiff's counsel.

### 2.    Notice Period

The statute of limitations under the FLSA is three years for willful violations and two years for non-willful violations. 29 U.S.C. § 255(a). Here, plaintiff alleges willful violations, *see* Am. Compl. ¶¶ 93, 100-01, 105; consequently, she requests that the notice period begin three years prior to the filing of her initial complaint (that is, that the Notice go to eligible workers who were employed at either restaurant on or after August 6, 2016). Pl. Mem. at 22-23. Defendants argue that any misconduct on their part was not willful and therefore that "the collective action period should only be two years" (that is, that the Notice go only to eligible workers who were employed on or after August 6, 2017). JR Sushi Mem. at 11-12; Famous Sichuan Mem. at 19-20.

Where, as here, "there has been no substantive discovery as to the appropriate temporal scope of the prospective class of member plaintiffs, and where the Plaintiff has alleged a willful violation of the FLSA, it is prudent to certify a broader class of plaintiffs that can be limited subsequently, if appropriate, during the second phase of the collective action certification process." *Anglada*, 2007 WL 1552511, at *8; *see also Gaspar v. Personal Touch Moving, Inc.*, 2014 WL 4593944, at *6 (S.D.N.Y. Sept. 15, 2014) ("where willfulness is disputed, it is appropriate to look to the three-year period in determining the scope of a collective action"); *Fasanelli*, 516 F. Supp. 2d at 323 (permitting a three-year period "[o]ut of an abundance of caution," as well as to "avoid any merit-based determinations at this time"). The Court agrees, and consequently the Court will certify a collective incorporating a three-year notice period.

In this Circuit, courts routinely calculate the notice period from the date on which the lawsuit was filed (not the date of conditional certification), "with the understanding that challenges to the timeliness of individual plaintiff's actions will be entertained at a later date." *Bittencourt v. Ferrara Bakery & Café Inc.*, 310 F.R.D. 106, 116-17 (S.D.N.Y. 2015) (quoting *Hamadou*, 915 F. Supp. 2d at 668, and collecting cases). Defendants do not dispute this point. Consequently, the Notice, once revised in accordance with this Memorandum and Order, will go to all non-managerial, non-exempt employees who were employed at JR Sushi and/or Famous Sichuan on or after August 6, 2016.

### 3.    Opt-in Period

The standard opt-in period in this Circuit, following conditional certification, is 60 days. *See Yap v. Mooncake Foods, Inc.*, 146 F. Supp. 3d 552, 566-67 (S.D.N.Y. 2015) ("[c]ourts in this Circuit routinely restrict the opt-in period to sixty days") (quoting *Fa Ting Wang v. Empire State Auto Corp.*, 2015 WL 4603117, at *11 (E.D.N.Y. July 29, 2015) (collecting cases)). Plaintiff requests a longer opt-in period (90 days), but makes no substantive argument for why 90 days is required here. Defendants, for their part, object to any opt-in period longer than 60 days. JR Sushi Mem. at 15; Famous Sichuan Mem. at 22-23. The Court agrees. *See Yap*, 146 F. Supp. 3d at 566-67 (reducing opt-in period from 90 to 60 days where plaintiffs failed to demonstrate "special circumstances" that would warrant more than the standard 60-day opt-in period); *Whitehorn*, 767 F. Supp. 2d at 451-52 (reducing FLSA notice period from 90 to 60 days where defendants objected to longer notice period and plaintiff did not explain why an extended period was necessary).

### 4.      Methods of Notice

Plaintiff proposes sending the Notice to members of the collective in Chinese as well as English. Pl. Mem. at 1, 20-21. "Generally, courts permit notice to be 'translated into the mother tongue of non-English speaking groups of potential plaintiffs.'" *Valerio v. RNC Indus., LLC*, 314 F.R.D. 61, 76 (E.D.N.Y. 2016) (quoting *Colon v. Major Perry Street Corp.*, 2013 WL 3328223, at *8 (S.D.N.Y. July 2, 2013)); *accord Sanchez v. El Rancho Sports Bar Corp.*, 2014 WL 1998236, at *5 (S.D.N.Y. May 13, 2014) (Spanish-language notice forms permitted). Here, plaintiff attests that many of her coworkers are from China, First Ke Aff. ¶ 23, 33, 41, 49, 59, 68, 79, 87, 96, 106, 115, 133, 142, and identifies them by their Mandarin honorifics or nicknames. *Id.* Under these circumstances, the Court agrees that plaintiff's counsel should have the Notice translated into Chinese and disseminate it in both English and Chinese.

As noted above, plaintiff also requests that the Court: (1) authorize plaintiff's counsel to disseminate the Notice via mail, email, text message or social media chat, and on counsel's website and on social media groups; (2) require defendants to post the Notice in a conspicuous location in their restaurants and to include it in employees' pay envelopes; and (3) authorize plaintiff's counsel to send a reminder, via mail and email, to all individuals who have failed to respond approximately halfway through the notice period. Pl. Mem. at 15-18. For the reasons set forth below, the Court will grant most of these requests.

The Court agrees that disseminating the Notice by mail, email, text message, and social media chat (addressed specifically to members of the proposed collective) is appropriate. *See Qiang Lu*, 447 F. Supp. 3d at 97 (permitting notice to be "disseminated in any relevant language via mail, email, text, or social media platform"); *Huer Huang v. Shanghai City Corp.*, 2020 WL 5849099, at *16 (S.D.N.Y. Oct. 1, 2020) (permitting notice on social media because "[s]ocial

media is now used to convey all kinds of important messages to the populace and has become an important means of receiving information") (collecting cases). Additionally, the Notice may be posted on plaintiff's counsel's website, *see Qiang Lu*, 447 F. Supp. 3d at 97 (permitting such posting), and must be displayed in a conspicuous location, convenient to employees, at both restaurants. *See Whitehorn*, 767 F. Supp. 2d at 449 (requiring posting of notice in defendants' restaurants over defendants' objections that such postings would "unnecessarily disturb their business"); *Trinidad*, 962 F. Supp. 2d at 564 (ordering defendants to post notice "in a non-public area" of six restaurant locations, noting that "Courts in this Circuit frequently approve posting in the workplace," and collecting cases).

However, the Court will not require defendants to include the Notice in the employees' pay envelopes. Plaintiff does not cite any Second Circuit authority for such a requirement, and courts in this Circuit have been wary of permitting this form of dissemination, as it "may suggest either that the notice originates with the employer or that filling it out may actually be required or expected by the employer." *Diaz v. New York Paving Inc.*, 340 F. Supp. 3d 372, 388 (S.D.N.Y. 2018); *see also Li Ni v. Red Tiger Dumpling House Inc.*, 2020 WL 7078533, at *12 (E.D.N.Y. Nov. 30, 2020) (denying plaintiff's request to disseminate the Notice in pay envelopes or with paycheck information because the court could not "locate any Second Circuit decision to date which states or suggests that providing notice through pay envelopes may be an appropriate method of dissemination in certain situations"); *Du*, 2020 WL 7404984, at *12 (same); *Chui v. Am. Yuexianggui of LI LLC*, 2020 WL 3618892, at *11 (E.D.N.Y. July 2, 2020) (same).

Nor will the Court authorize plaintiff's counsel to post a short form of the notice on public social media groups. Posting on public social media groups (unlike personalized social media messages) "would be overbroad and not likely to materially improve the chances of

29

notice" to a relatively small group of workers at two restaurants. *Zhang v. Ichiban Grp., LLC*, 2020 WL 1030651, at *11 (N.D.N.Y. Mar. 3, 2020) (quoting *Qian Xiong Lin*, 2019 WL 5842798, at *5); *see also Yuefeng Shi v. TL & CG Inc.*, 2020 WL 4586359, at *5 (S.D.N.Y. Aug. 10, 2020) (permitting distribution of notice by social media message only).

Finally, with respect to sending reminders via mail and email halfway through the opt-in period, the Court grants plaintiff's request. *See Chhab v. Darden Rests., Inc.*, 2013 U.S. Dist. LEXIS 135926, at *51 (S.D.N.Y. Sept. 19, 2013) (collecting cases).[11]

### F.   Equitable Tolling

Ordinarily, the statute of limitations in an FLSA collective action "continues to run with respect to each potential plaintiff's collective action claim until that plaintiff files the written consent form opting into the suit." *Whitehorn*, 767 F. Supp. 2d at 449; 29 U.S.C. § 256. In such a case, equitable tolling may be warranted to avoid "inequitable circumstances" where plaintiffs have acted with reasonable diligence in pursuing their claims," but where "a substantial number of class members may now be time-barred through no fault of counsel or the class representative." *Jackson*, 298 F.R.D. at 170.

Here, in order to avoid such "inequitable circumstances," plaintiff proactively seeks equitable tolling of the statute of limitations, for all potential opt-in plaintiffs, "for 90 days" or "until the expiration of the Opt-In Period." Pl. Mem. at 24.[12] That request is premature. At

---

[11] Defendants' objection to paying for the publication of an abbreviated form of the Notice should they fail to furnish a complete Excel list or should more than 20% of the notice be returned as undeliverable with no forwarding address, JR Sushi Mem. at 16; Famous Sichuan Mem. at 25, is premature. Plaintiff's proposed publication order merely provides that plaintiff "reserves the right to apply to the Court" for such an order. (Dkt. No. 70-4 ¶ 16.).

[12] The Court presumes (although plaintiff's brief does not expressly say so) that the proposed tolling period would begin with the publication of the Notice.

present, this case does not present the kind of "rare and exceptional circumstances" that would merit equitable tolling. *Andon v. SDG Props., Inc.*, 2018 WL 3970910, at *3 (S.D.N.Y. Aug. 20, 2018) ("Equitable tolling is appropriate only in rare and exceptional circumstances . . . where a plaintiff has been prevented in some extraordinary way from exercising his rights.") (internal quotations omitted). Because "the application of the equitable tolling standard is 'highly case-specific,' and the 'burden of demonstrating the appropriateness of equitable tolling . . . lies with the plaintiff,'" *Contrera v. Langer*, 278 F. Supp. 3d 702, 726 (S.D.N.Y. 2017) (quoting *Wilder v. U.S. Dep't of Veterans Affairs*, 175 F. Supp. 3d 82, 90 (S.D.N.Y. 2016)), equitable tolling is generally not appropriate at the conditional certification stage. The Court's ruling on this point is without prejudice to a later application for equitable tolling by one or more individual plaintiffs, should the situation so warrant. *See, e.g., Cuaya*, 2020 WL 5494371, at *13-14 (denying equitable tolling without prejudice because plaintiff "failed to allege that any potential opt-in plaintiff exists 'who intends to join the collective but who risks becoming time-barred or has been prevented in some extraordinary way from exercising his rights'").

## III.   CONCLUSION

For the foregoing reasons, plaintiff's motion for conditional collective certification is GRANTED as to non-managerial, non-exempt individuals employed at JR Sushi and/or Famous Sichuan on or after August 6, 2016.

It is hereby ORDERED that, no later than **February 5, 2021**:

1.    Defendants shall produce a spreadsheet, in Excel if possible, containing the names, last known mailing addresses, last known telephone numbers, last known email addresses, last known WhatsApp, WeChat and/or Facebook usernames, dates of employment, and positions of all non-managerial, non-exempt

individuals employed at JR Sushi and/or Famous Sichuan on or after August 6, 2016; and

2.       The parties shall, after meeting and conferring, prepare and submit to the Court, for approval, a revised form of notice (and related consent form) incorporating the Court's rulings.

The Court will conduct a telephonic status conference on **January 22, 2021, at 10:00 a.m.** to discuss the impact of this Order on the Famous Sichuan Defendants' pending motion for summary judgment. At that time, the parties are directed to call (888) 557-8511 and enter the access code 7746387.

The Clerk of Court is respectfully directed to close the motion at Dkt. No. 69.

Dated:  New York, New York
          January 15, 2021                                SO ORDERED.

                                                          **BARBARA MOSES**
                                                          **United States Magistrate Judge**