UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

YI MEI KE,

                                        Plaintiff,

                    -v-

JR SUSHI 2 INC, FAMOUS SICHUAN NEW YORK
INC, KAI TUAN WANG, *and* RUI YANG,

                                        Defendants.

19 Civ. 7332 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This decision resolves post-trial motions in this case under the Fair Labor Standards Act

of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the New York Labor Law ("NYLL"), § 190 *et*

*seq.* Plaintiff Yi Mei Ke ("Ke") sued defendants Kai Tuan Wang ("Wang") and Rui Yang

("Yang"), who are married, and two entities, JR Sushi 2 Inc ("JR Sushi") and Famous Sichuan

New York Inc ("Famous Sichuan") (collectively, "defendants"). Ke alleged that these

defendants did not pay her adequate minimum, overtime, and spread-of-hours wages for her

work as a kitchen assistant at JR Sushi, a restaurant in the Tribeca neighborhood of Manhattan.

After a two-day trial, a jury returned a special verdict that largely favored Ke. Relevant here, the

jury found that all defendants, save Famous Sichuan, had employed Ke, and failed to pay a

substantial amount of wages they owed her.

The defense moves for judgment as matter of law under Federal Rule of Civil

Procedure 50. It argues that the trial evidence was insufficient to support the jury's findings that

(1) Yang was one of Ke's employers at JR Sushi, and (2) Ke worked more than part time there.

The defense alternatively moves for a new trial under Rule 59, on the same grounds. Ke moves

to convert the special verdict into a judgment against JR Sushi, Wang, and Yang, under Rule 58. For the following reasons, the Court denies the defense motions and grants Ke's motion.

## I.      Background

### A.      Trial

Trial was held on October 28 and 29, 2025.  The evidence almost exclusively consisted of witness testimony—by Ke, Wang, and Yang—all translated from Mandarin.  Documentary evidence was limited: Ke offered a single undated, handwritten pay slip, and defendants offered a menu for Famous Sichuan.

The parties stipulated as follows:  Ke worked at JR Sushi, but never worked at Famous Sichuan (a different restaurant, located in Manhattan's Chinatown).  Yang was the sole owner of JR Sushi and Famous Sichuan, and was the restaurants' principal on their respective alcoholic beverage licenses.  As to JR Sushi, Wang was responsible for determining employee compensation, work schedules, and time actually worked; maintaining payroll records and paying employees; and hiring and firing employees.  Dkt. 201-1 ("Tr.") at 46–48.

The Court summarizes the three witnesses' testimony below.

#### 1.      Ke's Testimony

Ke testified as follows.  In January 2017, Ke began working as a kitchen assistant at JR Sushi.  *Id.* at 49–50, 54–55.  It was her first job in the United States.  *Id.*  Based on a referral, Wang had interviewed and hired her.  *Id.* at 50–51.  Her work consisted of miscellaneous kitchen tasks (*e.g.*, assembling bento boxes and preparing employee meals).  *Id.* at 51–55, 60–61.  Wang told her she would work six days per week (every day except Saturdays) between 11 a.m. and 11 p.m., with a one-hour break each workday.  *Id.* at 51–52, 54.  He also told her her salary would start at $1,700 per month, to be paid in semimonthly installments.  *Id.* at 62.

2

Ke was never provided with a written notice stating her pay rate. *Id.* at 53. She was generally unfamiliar with federal and state wage laws and practices. *Id.* She did not know the minimum wage rate, or compare her actual pay to that rate. *Id.* at 53–54.

Between January 2017 and May or June 2018, Ke worked 12 hours a day, six days per week. *Id.* at 56–57. She did not receive the one-hour break that Wang had promised her. *Id.* at 52. In May or June 2018, due to an employee shortage, Ke began also working on Saturdays. *Id.* at 55–58. On Saturdays, she worked between approximately 4 and 11 p.m., but sometimes started around 2 or 3 p.m. *Id.* From this point on, she did not have a full day off while employed at JR Sushi. *Id.* at 59. JR Sushi did not have a formal system for tracking the time employees started and stopped work. *Id.*

As to pay, between January and approximately March 2017, Ke received $1,700 in cash per month. *See id.* at 52–53, 59–60. Around March 2017, her pay increased to $1,750 per month; around March 2018, it increased to $1,850 per month. *Id.* Later, when Ke took on additional duties, such as frying tempura, her pay increased further.[1] *Id.* at 60–62. By approximately January 2019, her monthly salary was $2,000, where it remained until she resigned from JR Sushi. *Id.* at 64–65. Wang decided the timing and amount of each raise. *Id.* at 65.

Wang gave Ke handwritten pay slips with her semimonthly wages. *See id.* at 63–65. The only documentary evidence adduced concerning Ke's employment was one such pay slip, reproduced below with an English translation:

---

[1] Ke did not testify as to exactly when, or by how much, her pay increased at this point.



Ke Yi Mei          Missing 1 day
                   Add 1 day

1000     + 20  ( = 2 hours)

            = 1020

*Id.*; PX 9 ("Pay Slip"). The $1,000 reflected half a month's pay, plus $20 for two hours' additional work. Tr. at 63–65.

Ke testified as follows regarding Yang's involvement at JR Sushi. Yang "often" came to JR Sushi and adjusted its menu prices. *Id.* at 65–66; *see also id.* at 66 (Wang "sometimes" asked Yang or their daughter to set menu prices). Yang also had access to the live surveillance camera feed for JR Sushi. *Id.* at 67–68. Yang reviewed this footage to "[find] out [when] the employees were being lazy." *Id.* at 67–68, 91–92. Yang would then call employees to direct them to return to work—for example, by telling them "you cannot sit on the top of the stairs." *Id.* Yang also asked Wang to send the JR Sushi employee responsible for packaging delivery orders to assist with deliveries at Famous Sichuan. *Id.* at 72–73. And an employee from Famous Sichuan named Yi Ba was "sent over" to JR Sushi to help with deliveries. *Id.* at 73–74; *see also id.* at 76 (on cross-examination, Ke was asked, "Did you ever personally hear [] Yang instruct any worker to come to work at JR Sushi?," to which she answered "yes"), 91 (on redirect, Ke testified that Wang told her that Famous Sichuan employees were dispatched to work at JR Sushi). Yang

4

would also "come over [to JR Sushi] when there are certain things that need to be done." *Id.* at 78.  When semimonthly cash payments were distributed to JR Sushi employees, "the lady boss [Yang] would give the money to the boss [Wang] to pay us." *Id.* at 79.

On cross-examination, however, Ke testified that Yang had never directed Ke's own work at JR Sushi. *Id.* at 79–80.  She also testified that Yang did not pay her, and that Ke had not seen Yang hire or fire anyone at JR Sushi. *Id.*  Defense counsel also sought to impeach Ke on the following two issues.  First, although Ke testified at trial that she had resigned from JR Sushi on October 2, 2019, she had earlier testified, at a pre-trial deposition, that she had left JR Sushi in August 2019. *Id.* at 80–81.  Second, Ke testified at trial that her starting salary at JR Sushi was $1,700 per month, with intermittent raises resulting in a salary of $2,000 per month by the time she resigned. *Id.* at 82–83.  At her earlier deposition, however, Ke had testified that her pay was initially $1,800 per month; that it increased to $1,900 per month after the first month of work; and that it had increased to $2,100 per month by the time she resigned. *Id.* at 82–85.[2]

At the end of Ke's cross-examination, defense counsel asked: "You were a part-time employee at JR Sushi, is that correct?"  Ke answered: "Yes, employee."  On redirect, Ke testified that she did not understand the distinction between full-time and part-time employees. *Id.* at 90–91.

---

[2] Ke also testified on cross-examination that Wang had ordered an individual named Guoli Zhang and Zhang's cousin to physically attack Ke. *Id.* at 85–86.  She testified that she had never asked anyone to pay for her medical expenses or to otherwise give her money in connection with that event. *Id.* at 87.  At her earlier deposition, however, she had testified that she had asked Zhang to "pay compensation for the injury to my neck" from that incident, and asked Wang to pay her medical expenses because Zhang had refused to do so. *Id.* at 88.

### 2.    Wang's Testimony

Wang testified as follows.  In 2017, he interviewed and hired Ke for "odd jobs" at JR Sushi.  *Id.* at 99, 106.  He hired her to work between 5 and 10 p.m., six days per week (every day except Saturdays).  *Id.* at 99, 103.  Her wages had started at $1,800 per month, but he raised them to $1,900 per month after her first month, because she was "dedicated" and "working hard."  *Id.* at 99.  For Ke's third month, Wang raised her pay to $2,000 per month.  *Id.*  By January 2019, Wang had increased Ke's salary to $2,100.  *Id.* at 107–08.  He paid her these amounts in semimonthly cash installments.  *Id.*

He also testified regarding the nature of his wife Yang's involvement in JR Sushi.  Yang formally owned JR Sushi because she had a better credit score than he did.  *Id.* at 96.  In practice, however, Wang operated the restaurant alone, without his wife's participation.  *Id.*  He denied that Yang had supervised any JR Sushi employee, including Ke; observed JR Sushi employees via surveillance video and/or given them any instructions; or sent any employees from Famous Sichuan to JR Sushi (or vice versa).  *Id.* at 98–99.

On cross-examination, Wang admitted that he did not keep written records as to the hours Ke had worked at JR Sushi.  *Id.* at 103.  He agreed that the pay slip reflected his handwriting.  *Id.* at 110.  He testified that the pay slip would have been from 2018, because Ke then earned $2,000 per month.  As to the additional $20, he explained that this sum was for "wiping the windows." *Id.* at 111.  This task had taken between one and two hours, he explained, so he had paid her for two hours.  *Id.*[3]

---

[3] Wang denied having directed Zhang, Zhang's cousin, or any other employee to attack Ke.  *Id.* at 100–01.  He testified that Ke and Zhang had gotten into a fight, after which Ke asked Zhang for $16,000.  *Id.*  When Zhang refused, Ke asked Wang to pay her that sum.  *Id.*  Wang fired Zhang but refused to pay Ke.  *Id.* at 100–01, 158.  Ke resigned from JR Sushi two months after the incident.  *Id.* at 100–01.

### 3. Yang's Testimony

Yang's testimony largely tracked her husband's. She testified that she operated Famous Sichuan, but not JR Sushi. *See id.* at 165–70. She denied, as to JR Sushi, viewing surveillance footage; giving directions to any employees, including Ke; having authority to hire or fire employees, set pay rates, or keep employment records; or otherwise having any operational control. *Id.* at 169–73. The two restaurants did not share any employees, including any who helped with delivery orders. *Id.* at 169.[4] She was too busy to intervene in JR Sushi's affairs, she stated, because she worked more than 10 hours a day, seven days a week, managing Famous Sichuan, on top of caring for her two children and her parents. *Id.* at 170–71. She trusted her husband to manage JR Sushi independently. *Id.* at 171. She was the sole owner of JR Sushi because she had better credit than her husband, which the landlord preferred. *Id.* at 170–71. She had not known of Ke until this lawsuit was filed. *Id.* at 171–72.

On cross-examination, Yang admitted that she had updated the prices on JR Sushi's menu "once a year or every two years," based on rising costs. *Id.* at 183. Asked why her name was on JR Sushi's alcoholic beverage license—notwithstanding that her credit score might be irrelevant to the licensing authority—she testified that the liquor board required an applicant to be listed on the restaurant lease, and that the JR Sushi lease only bore her name. *Id.* at 176–77.

On redirect examination, Yang denied having ever changed menu prices for JR Sushi, contrary to her testimony on cross-examination. *Id.* at 187.

---

[4] Any overlap between the two restaurants was limited, Yang testified, to an annual Chinese New Year celebration that Wang arranged for employees of both restaurants. Tr. at 172, 183–84. She did not attend these events. *Id.*

### 4.    The Defense's Rule 50(a) Motion

After summations, the defense moved for judgment as a matter of law under Rule 50(a). *Id.* at 232–33.  The Court asked defense counsel to summarize the motion.  *Id.*  Defense counsel argued there was insufficient evidence that (1) Yang or Famous Sichuan were employers of Ke, within the meaning of the FLSA and NYLL; and (2) Ke had worked more than part time at JR Sushi (and thus was owed any unpaid wages), based on her ostensible admission on cross-examination that she had been a "part-time" employee.  *Id.*  The Court reserved judgment on the motions.  *Id.*

### 5.    The Special Verdict

The jury returned a special verdict that overwhelmingly favored Ke.  *See* Dkt. 195 ("Verdict").  It found as follows.

JR Sushi, Wang, and Yang (collectively, the "liable employers")—but not Famous Sichuan—had employed Ke between January 2017 and August 2019.  *Id.* at 1–2.[5]  Between January 2017 and April 30, 2018, she worked 72 hours per week.  *Id.* at 2–3.  Between May 1, 2018 and August 2019, she worked 79 hours per week.  *Id.* at 3.

As to pay, Ke was paid at a salary (*i.e.*, flat) rate.  *Id.*  Between January 2017 and December 30, 2018, her flat rate was $438 per work week (*i.e.*, $10.95 per hour regular rate of pay).  *Id.*  Between December 31, 2018 and August 2019, her flat rate was $461.54 per work week (*i.e.*, $11.54 per hour regular rate of pay).  *Id.*  Ke thus was not paid a minimum wage at any point in her employment.  *Id.*

As to overtime, Ke worked the following overtime hours (*i.e.*, total compensable hours per week, minus 40): 32 per week between January 2017 and April 30, 2018; and 39 per week

---

[5] The jury did not here specify dates in January or August, but elsewhere found that Ke had worked "134" weeks total.

between May 1, 2018 and August 2019. *Id.* at 4. She was not properly compensated for these hours. *Id.* Ke's spread of hours—*i.e.*, the interval between the start and end of a workday, including breaks—exceeded 10 hours during her employment, but she was not properly compensated for such. *Id.*

The jury calculated Ke's total hours and pay as follows:

| Year | Number of regular hours worked by Ke | Number of overtime hours worked by Ke | Total wages paid to Ke per year | Number of days in which Ke worked more than 10 hours without receiving spread-of-hours pay |
|---|---|---|---|---|
| Dec. 31, 2016 through Dec. 30, 2017 | 2,080 | 1,664 | $22,800 | 312 |
| Dec. 31, 2017 through Dec. 30, 2018 | 2,080 | 1,906.7 | $22,800 | 312 |
| Dec. 31, 2018 through Dec. 30, 2019 | 1,213 | 1,183 | $14,000 | 182 |

*Id.* at 5.

The jury found that Ke had not been provided adequate wage notices or statements for a period of 134 weeks. *Id.* at 6. Lastly, it found that JR Sushi, Wang, and Yang had not acted in good faith when they failed to pay Ke minimum, overtime, and spread-of-hours wages, and when they failed to provide Ke with adequate wage notices and wage statements. *Id.* at 6–7.

### 6. Post-Trial Motions

On November 26, 2025, Ke moved for judgment based on the special verdict, pursuant to Rule 58(b)(2). Dkts. 197 ("Ke Mot."), 198 ("Schweitzer Decl."), 199 ("Ke Mem."). The same day, the defense moved for judgment as a matter of law under Rule 50(b) or, alternatively, a new

trial under Rule 59. Dkts. 200 ("Def. Mot."), 201 ("Xue Decl."), 202 ("Def. Mem."). On January 7, 2026, both sides opposed. Dkts. 205 ("Def. Opp'n"), 206 ("Ke Opp'n"). On January 26, 2026, both sides replied. Dkts. 207 ("Def. Reply"), 208 ("Ke Reply").

## II.    Discussion

The defense moves for judgment as a matter of law under Rule 50(b). It argues that the trial evidence was insufficient to support the jury's findings that (1) Yang was one of Ke's employers at JR Sushi,[6] and (2) Ke worked more than part time there. The defense alternatively moves for a new trial under Rule 59, on the same grounds. Ke, in turn, moves to convert the special verdict into a judgment against JR Sushi, Wang, and Yang, under Rule 58(b)(2)(A). The Court addresses these motions in turn.

### A.    Legal Standards Governing Rules 50 and 59

***Rule 50***: To grant a motion for judgment as a matter of law, the Court must find that "a reasonable jury would not have a legally sufficient evidentiary basis to find for [the non-moving] party on that issue." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 197 (2d Cir. 2014) (quoting Fed. R. Civ. P. 50(a)). Such a determination is appropriate "only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 127–28 (2d Cir. 2012) (citation omitted).

---

[6] To be liable under the FLSA and NYLL, an individual must have been an "employer." *See Herman v. RSR Sec. Serv. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999). An employee working a single job may have multiple liable employers under those statutes. *See, e.g.*, *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008).

In resolving a Rule 50 motion, the Court reviews all the record evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, the Court must disregard evidence favorable to the moving party that the jury was not required to credit (*i.e.*, because it was impeached or disputed). *Id.* at 150–51. The Court must view the evidence "in the light most favorable to the [non-moving] party" and "give deference to all credibility determinations and reasonable inferences of the jury." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998).

The Court "may grant a motion for judgment as a matter of law only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been *compelled* to accept the view of the moving party." *Zellner v. Summerlin*, 494 F.3d 344, 370–71 (2d Cir. 2007) (emphasis in original) (citation omitted). The moving party thus bears a "heavy burden." *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011).

**Rule 59**: The burden for granting a new trial under Rule 59 is lighter than that for granting judgment as a matter of law under Rule 50. *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998). Nonetheless, "jury verdicts should be disturbed with great infrequency." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012). Rule 59 allows a court to grant a new trial after a jury verdict "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Such may be granted "if the verdict is against the weight of the evidence"—that is, if verdict was "seriously erroneous" or a "miscarriage of justice." *Raedle*, 670 F.3d at 417–18 (citation omitted). On a motion for a new trial, the jury's witness-credibility determinations are entitled to deference; a

11

court "may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." *Id.* at 418 (citation omitted).

### B. Analysis of the Defense's Arguments Under Rules 50 and 59

#### 1. Whether Yang Was One of Ke's Employers

The defense argues that the trial evidence was insufficient to support the jury's special verdict that Yang was an employer of Ke, as required for liability under the FLSA and NYLL. It also argues, alternatively, that a new trial on this issue is warranted.

The FLSA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Supreme Court has termed this definition "expansive." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (quoting *Falk v. Brennan*, 414 U.S. 190, 195 (1973)); *see also id.* ("beyond the plain language, moreover, the remedial nature of the statute further warrants an expansive interpretation of its provisions" (citing *Carter v. Dutchess Comm. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984))). The NYLL speaks in similarly broad terms. It defines an employer as any individual or business "employing any individual in any occupation, industry, trade, business or service." NYLL § 190(3). To be employed means that a person is "employed or permitted to work by an employer in any occupation," subject to exceptions not applicable here. NYLL § 651(5); *see Irizarry v. Catsimatidis*, 722 F.3d 99, 117 (2d Cir. 2013).

Courts in this Circuit treat the FLSA and NYLL's definitions of employer identically. *See, e.g.*, *Bravo v. Shamailov*, 221 F. Supp. 3d 413, 421–22 & n.11 (S.D.N.Y. 2016); *Chen v. 2425 Broadway Chao Rest.*, No. 16 Civ. 5735, 2019 WL 1244291, at *8 (S.D.N.Y. Mar. 18, 2019). Under both statutes, an employer has the ability to control, in whole or in part, a company's operations in a manner related to the employment of the company's employees. *See Irizarry*, 722 F.3d at 109. A single employee can have multiple employers. *See, e.g.*, *Barfield v.*

12

*N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008); *Gordon v. Gen. Prop. Mgmt. Assocs., Inc.*, 496 F. Supp. 3d 830, 839 (S.D.N.Y. 2020); *Chen*, 2019 WL 1244291, at *8.

In determining whether an individual is an employer under either statute, the factfinder must consider the totality of the circumstances that constitute the "economic reality" of the putative employee-employer relationship. *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 422 (2d Cir. 2016). The factfinder evaluates whether there is evidence showing the potential employer's "authority over management, supervision, and oversight of [the company's] affairs in general." *Irizarry*, 722 F.3d at 111. The Second Circuit has identified four non-exhaustive factors that can inform whether an employer-employee relationship exists. These include the putative employer's (1) power to hire and fire employees, (2) supervision and control of employee work schedules or conditions of employment, (3) authority to determine the rate and method of payment, and (4) maintenance of employment records. *Herman*, 172 F.3d at 139 (citing *Carter*, 735 F.2d at 12). None of these factors is dispositive, and the factfinder may consider any admissible evidence it finds pertinent to the employer-employee relationship. *Id.* Ownership in the company, alone, is insufficient to establish employer status, unless the owner has "operational control" over the company's employees. *Irizarry*, 722 F.3d at 110–11. "[T]he overarching concern [is] whether the alleged employer possessed the power to control the workers in question." *Id.* at 105.

Here, the trial evidence related to Yang's involvement at JR Sushi was entirely testimonial. Ke testified as follows regarding Yang's involvement at JR Sushi. Yang "often" visited that restaurant when "certain things [needed] to be done." Tr. at 65–66, 78. Yang adjusted JR Sushi's menu prices, based on rising ingredient costs. *Id.* at 65–66. Yang had access to JR Sushi's live surveillance camera feed; watched that footage to assess whether its

13

"employees were being lazy"; and called those employees and instructed them to keep working (*e.g.*, by telling them not to "sit on the top of the stairs" in the restaurant). *Id.* at 67–68, 91–92. Yang asked Wang to send the JR Sushi employee who packaged delivery orders to Famous Sichuan, to assist with deliveries there. *Id.* at 72–73. Yang instructed Famous Sichuan employees to help at JR Sushi. *Id.* at 76, 91; *see also id.* at 73–74 (Yi Ba, an employee at Famous Sichuan, was dispatched to JR Sushi to help with deliveries). When semimonthly pay was to be distributed to JR Sushi employees, Yang gave Wang cash for such payments. *Id.* at 79. And, although not dispositive, the parties stipulated that Yang owned 100% of JR Sushi and served as the principal on its alcoholic beverage license. *Id.* at 46–47.[7]

Yang and Wang flatly contradicted most of these points in their testimony. They both denied that Yang viewed JR Sushi's surveillance footage; directed any JR Sushi employees; shared employees between JR Sushi and Famous Sichuan; or was otherwise involved in JR Sushi's operations during Ke's employment. *See, e.g.*, *id.* at 165–72. *But see id.* at 183, 187 (Yang admitted on cross-examination that she updated prices on JR Sushi's menu approximately "once a year or every two years," but then denied such during redirect examination). They also explained that Yang owned JR Sushi, and served as its liquor license principal, merely because she had better credit than Wang, and thus needed to be on the restaurant's lease—not because she had operational control over the restaurant. *Id.* at 96, 170–71, 176–77.

---

[7] As the defense notes, the Court struck much of Ke's testimony as inadmissible hearsay or unresponsive. All the above testimony, however, was admitted. The defense argues that certain testimony should be disregarded on these motions, because it constitutes inadmissible hearsay, notwithstanding that the defense did not object to it at trial and the Court did not strike it *sua sponte.* That position is meritless. *See Diaz v. United States*, 223 U.S. 442, 450 (1912) (where hearsay evidence admitted without objection, "it is to be considered and given its natural probative effect as if it were in law admissible"); *Gronowski v. Spencer*, 424 F.3d 285, 294 n.1 (2d Cir. 2005) (same); *United States v. Brown*, 348 F.2d 661, 663 (2d Cir. 1965) (same).

In finding Yang to have employed Ke, the jury plainly credited Ke's testimony, and rejected Wang and Yang's. The Court defers, as it must, to the jury's witness-credibility determinations. *See Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 112–13 (2d Cir. 2015); *see also Zellner*, 494 F.3d at 370–71 (on Rule 50 motion, courts must make credibility assessments and inferences against movants). Ke's testimony gave the jury a more than sufficient basis on which to reasonably conclude that Yang exercised operational control over JR Sushi. Her testimony supported that Yang, at least to some extent, controlled work schedules and employment conditions—*e.g.*, by watching a live surveillance feed inside JR Sushi and instructing employees not to take breaks based on that footage, and by using certain JR Sushi and Famous Sichuan employees interchangeably between the two restaurants. *See Herman*, 172 F.3d at 139. Ke's testimony also supported that Yang exercised a degree of "oversight of [JR Sushi's] affairs in general," including by periodically evaluating its costs and setting menu prices based on them. *Irizarry*, 722 F.3d at 111. It supplied a basis to find that Yang determined, or helped determine, how JR Sushi employees' wages were paid—*i.e.*, by disbursing cash to her husband Wang when it came time to distribute JR Sushi employees' semimonthly wages. And the jury could reasonably draw inferences corroborating Ke's testimony from the undisputed facts that (1) Wang and Yang were married (making it more reasonable to infer their collaboration), and (2) Yang was JR Sushi's sole owner and liquor license principal.

The jury thus had sufficient evidence to find that Yang, although not the primary manager of JR Sushi, nonetheless had operational control over that restaurant's employees so as to be deemed Ke's employer under the FLSA and NYLL. *See, e.g.*, *Irizarry*, 722 F.3d at 111–17 (finding grocery chain president employer of individual stores' employees; although president "did not exercise managerial control in stores on the day-to-day level of a manager, the evidence

15

demonstrates that he exercised influence in specific stores on multiple occasions," *e.g.*, by coordinating displays of products and "address[ing] problems that occurred in individual stores"); *Herman*, 172 F.3d at 140 (finding board chair of security company employer of its security guards, where that individual had assigned guards to specific work locations "on occasion," signed paychecks on "at least three occasions," and "controlled the company financially"); *Bravo*, 221 F. Supp. 3d at 424–25 (finding sole shareholder of pizzeria employer, where she "met with" pizzeria's manager concerning that business, "occasionally gave orders to [the manager] and other employees," and "fired at least one employee").[8]

The defense makes two additional counterarguments.[9]  Neither is persuasive.

First, it argues that Yang cannot have been Ke's employer because Wang and Yang both testified that Yang "never gave directions" to any JR Sushi employees.  Def. Mem. at 7.  The jury, however, clearly chose to credit Ke's contradictory testimony—that Yang had in fact instructed JR Sushi employees, such as by calling and telling them to return to work after she saw on surveillance footage that they were taking breaks—and thus to discredit Wang and Yang's account.  The Court must defer to such credibility determinations.  *See Wiercinski*, 787 F.3d at 112–13; *Zellner*, 494 F.3d at 370–71.

Second, it argues that, at trial, Ke admitted that Yang never gave work-related instructions to Ke individually.  *See* Def. Mem. at 7.  But the Second Circuit has held that, to

---

[8] Ke did not adduce evidence that Yang had authority, as to JR Sushi, to hire or fire employees, determine wage rates, or maintain employment records.  Under the holistic "economic reality" test, however, courts in this District have frequently found that an individual qualifies as an employer "even when several of the *Carter* factors do not apply."  *Chen*, 2019 WL 1244291, at *8; *see Jin Dong Wang v. LW Rest.*, 81 F. Supp. 3d 241, 256 (E.D.N.Y. 2015).

[9] Insofar as the defense argues that the non-exhaustive factors listed in *Carter*, *supra*, disfavor the jury's finding that Yang employed Ke, *see* Def. Mem. at 5–10, the Court has addressed such arguments in the analysis above.

qualify as an employer, an individual need not have given employment directions to the plaintiff. *See Irizarry*, 722 F.3d at 110 (individual employer need not have "directly come into contact with the plaintiffs, their workplaces, or their schedules"). The trial evidence showed that Yang exercised sufficient operational control over JR Sushi employees generally—including based on her directions to other employees—to be found Ke's employer.

The Court thus holds that there was sufficient evidence to support the jury's special verdict that Yang was an employer of Ke's. *See, e.g.*, *Irizarry*, 722 F.3d at 111–17; *Herman*, 172 F.3d at 140; *Bravo*, 221 F. Supp. 3d at 424–25. It thus denies the defense's Rule 50(b) motion on this point. For the same reasons, the Court also finds that the special verdict was neither seriously erroneous nor a miscarriage of justice. Given the absence of documentary evidence bearing on Yang's employer status, the jury's findings on this point hinged entirely on whether it credited Ke's testimony over Yang and Wang's contradictory account. The jury's choice to believe Ke was not unreasonable, and warrants deference. The Court thus denies the defense's motion for a new trial on this issue. *See, e.g.*, *Bravo*, 221 F. Supp. 3d at 426–27 (denying Rule 59 motion by defendant whom jury had found an employer, and deferring to jury's decision not to credit defendant's contrary testimony); *Frazier v. FCBC Cmty. Dev. Corp.*, No. 22 Civ. 5270, 2024 WL 3666372, at *6–7 (S.D.N.Y. Aug. 6, 2024) (same, emphasizing importance of jury's witness-credibility assessment, due to lack of non-testimonial evidence offered by both sides); *see also Zheng v. Liberty Apparel Co. Inc.*, 617 F.3d 182, 185 (2d Cir. 2010) (juries "especially well-suited" to determine joint employer status of individuals, because such is multi-factor, mixed question of law and fact).

17

### 2.    Whether Ke Worked More Than Part Time at JR Sushi

The defense next argues that the trial evidence was insufficient to support that Ke was owed any minimum, overtime, or spread-of-hours pay.  The defense bases this argument on a two-word response that Ke gave during cross-examination.  In that colloquy, defense counsel asked, "Ms. Ke, you were [a] part-time employee at JR Sushi, is that correct?," to which Ke responded, "Yes, employee."  Tr. at 90.  The defense argues that this constitutes an admission by Ke that she was a part-time employee at JR Sushi.  It argues that, by definition, Ke thus could not have been owed overtime or spread-of-hours wages, and, based on the wages she actually received, was paid above the minimum wage rate.

Ke counters that (1) the defense did not adequately specify the grounds for its Rule 50(a) motion on this point, and, having not preserved this point, cannot move on this ground now under Rule 50(b); and (2) regardless, the trial evidence was sufficient to show that Ke worked far in excess of part time at JR Sushi.

***The defense's Rule 50(a) motion***:  A party may move for judgment as a matter of law "at any time before the case is submitted to the jury."  Fed. R. Civ. P. 50(a).  After an unfavorable verdict, the party may renew its motion.  Fed. R. Civ. P. 50(b).  The renewed motion, however, is "limited to those grounds that were specifically raised in the prior motion" for judgment as a matter of law; new grounds may not be added post-trial.  *Galdieri-Ambrosini*, 136 F.3d at 286 (citation omitted).  Rule 50 is structured to give the non-moving party "an opportunity to cure any deficiency in that party's proof."  *Lore v. City of Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012).  Accordingly, "the motion must at least identify the specific element that the defendant contends is insufficiently supported."  *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 164 (2d Cir. 1998) (citation omitted).  "The ultimate question is whether the motion, either of itself or in the context of the

18

ensuing colloquy, was sufficiently specific to alert the opposing party to the supposed deficiencies in her proof." *Galdieri-Ambrosini*, 136 F.3d at 287.

Here, the defense moved under Rule 50(a) after closing arguments, before the case was submitted to the jury. Tr. at 232–33. The Court directed defense counsel to "briefly summarize" the substance of those motions. *Id.* In pertinent part, defense counsel described its motion as follows: "[Ke] admits she's a part-time employee. She did not testify credibly, so her wage and hour claims should be dismissed." *Id.* at 233.

This Rule 50(a) motion was undoubtedly terse. But it adequately apprised Ke and her counsel of the specific grounds of its renewed motion under Rule 50(b). Both the original and renewed motions turn on the same narrow basis: that Ke's "Yes, employee" answer to the question of whether she had worked as a "part-time employee" at JR Sushi bound her and made it impossible for any reasonable juror to conclude that she had worked the overtime hours to which she testified, or been paid below the minimum wage rate, applying her semimonthly pay to part-time hours. Ke and her counsel thus had an adequate opportunity, after the defense's Rule 50(a) motion and before the case was submitted to the jury, to cure any deficiencies in Ke's proof on that issue. The motion met the specificity requirements of Rule 50(a)(2). *See, e.g.*, *Negron v. Wesolowski*, 536 F. App'x 151, 153–54 (2d Cir. 2013) (summary order) (short, high-level Rule 50(a) motion placed non-movants on notice and met Rule 50(a)(2)'s specificity requirement); *McCarthy v. N.Y.C. Tech. Coll.*, No. 93 Civ. 7438, 1997 WL 540811, at *3–4 (S.D.N.Y. Sept. 3, 1997) (same), *aff'd*, 202 F.3d 161 (2d Cir. 2000); *Jennings v. Yurkiw*, No. 14 Civ. 6377, 2018 WL 5630454, at *4 (E.D.N.Y. Oct. 31, 2018) (same), *aff'd*, 18 F.4th 383 (2d Cir. 2021).

19

***The defense's motions under Rules 50(b) and 59***:  Having found this Rule 50(b) motion adequately preserved, the Court turns to its merits.  The defense argues, based on Ke's "Yes, employee" response, that no reasonable jury could have credited her testimony that she worked far in excess of full-time hours and was paid less than minimum wage based on those hours. That is wrong, for several reasons.

First, Ke's response was highly ambiguous.  "Yes, employee" did not necessarily mean that Ke agreed with defense counsel's characterization that she was a "part-time employee at JR Sushi."  On the contrary, the most logical interpretation of that response is that it was shorthand for "Yes, I was an employee at JR Sushi," not that it adopted defense counsel's position that Ke only worked part time there.  And the ambiguity inherent in this response was consistent with Ke's testimony overall.  Defense counsel's question first had to be translated into Mandarin for Ke, and her Mandarin-language response then translated back into English for the jury.  And, as the trial transcript reflects, Ke's testimony throughout reflected that Ke had substantial difficulty understanding the questions put to her, especially where they involved employment terminology, and providing responsive answers.[10]  A reasonable juror could readily conclude that Ke's two-word response here was not an admission that she had only worked part time at JR Sushi.

Second, on redirect examination moments after that exchange, Ke testified that she did not understand the term "part-time employee."  Ke and her counsel had the following colloquy:

---

[10] *See, e.g.*, Tr. at 53 ("Q. Did you have any knowledge what the minimum wage was at the time of your interview?  A. I did not understand it.  Q. You did not understand my question, or you're talking about your state of mind at the time?  A. What do you mean by minimum wage?  Q. A floor [of] minimum wage set by the government, did you know at the time of your interview what the minimum wage was?  A. I did not know that."), 58 ("Q. Were there any changes to your schedule throughout the remainder of your employment?  A. Well, anyhow, I just went there for work when it was time.  Then I got off work.").

Q. Ms. Ke, sitting here today, what in your mind is the difference between a part-time employee and a full-time employee, if any?

A. I just know that there are employees.

Q. Is there a difference between part time and full time in your mind?

A. I know full-time employees, but I'm not sure about others.

Q. You don't know what is meant by "part-time employees," correct?

A. I don't quite understand it.

Tr. at 90–91. Such testimony strongly supports that her "Yes, employee" response on cross-examination was not intended to answer the specific question—one way or another—whether she had been a part-time employee.

Third, even if Ke had admitted on cross-examination that she was a part-time employee—which she did not—she gave much more specific testimony, before that exchange, as to the hours she worked at JR Sushi (which far exceeded full-time work) and the wages she was paid (which fell well below the statutory minimums, based on the number of hours to which she testified). *See, e.g.*, *id.* at 51–54 (starting in 2017, Ke worked at JR Sushi between 11 a.m. and 11 p.m. six days per week, for $1,700 per month), 55–58 (starting in summer 2018, Ke worked an additional seven to 10 hours on Saturdays), 64–65 (by approximately January 2019, Ke's salary had been raised to $2,000). And the defense did not preserve, or offer any evidence that it had maintained, adequate records with respect to employee hours. Under these circumstances, Ke's testimony estimating the hours she had worked was sufficient to carry the day. *See Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011) ("if an employer's records are inaccurate or inadequate, an employee need only present sufficient evidence to show the amount and extent of the uncompensated work as a matter of just and reasonable inference," and may "meet this burden through estimates based on his own recollection" (citation omitted)).

21

In sum, the jury was presented with sufficient testimony on which to find that Ke was entitled to unpaid minimum, overtime, and spread-of-hours wages. Ke's two-word, ambiguous response on cross-examination does not supply a basis to disturb those findings. *See, e.g.*, *Perry v. City of New York*, 78 F.4th 502, 512 (2d Cir. 2023) (in FLSA case, "[t]hough there were facts supporting both sides—there always are—plaintiffs presented enough evidence of [defendant's] policy or practice of requiring overtime work to support the jury's verdict"); *Kim v. 167 Nail Plaza*, No. 05 Civ. 8560, 2008 WL 2676598, at *2 (S.D.N.Y. July 7, 2008) (denying Rule 50(b) motion in FLSA case where "jury considered [] competing testimony, found plaintiff more credible, and decided in her favor"); *Gortat v. Capala Bros.*, 949 F. Supp. 2d 374, 384–85 (E.D.N.Y. 2013) (similar). For the same reasons, the Court also finds a new trial unwarranted, as the jury's special verdict concerning Ke's unpaid wages was neither seriously erroneous nor a miscarriage of justice. *See, e.g.*, *Aguilar v. Ham N Eggery Deli Inc.*, No. 15 Civ. 2781, 2019 WL 4247228, *4–6 (E.D.N.Y. Sept. 5, 2019) (denying Rule 59 motion where jury had credited plaintiffs' testimony concerning their hours and pay rates, notwithstanding conflicting defense testimony); *Lin v. DJ's Int'l Buffet, Inc.*, No. 17 Civ. 4994, 2024 WL 4315031, at *3–4 (E.D.N.Y. Sept. 27, 2024) (same, as to time period plaintiff worked).

### C.     Ke's Rule 58 Motion

Ke moves for judgment against the liable employers—JR Sushi, Wang, and Yang— pursuant to Rule 58. That Rule requires entry of such judgment where, as here, a jury has returned a special verdict. Fed. R. Civ. P. 58(b)(2)(A). Ke specifically seeks (1) $109,967.65 in unpaid minimum, overtime, and spread-of-hours wages; (2) 9% per annum prejudgment interest on those wages, measured from the midpoint of Ke's employment through the entry of judgment; (3) $109,967.65 in liquidated damages (*i.e.*, the same amount as Ke's unpaid wages) under the

NYLL; and (4) $10,000 in statutory damages, under the NYLL, for failure to provide wage notices and statements (*i.e.*, $5,000 for each category).  Her counsel submitted a declaration calculating the above amounts, and a proposed judgment.  *See* Schweitzer Decl.

The defense opposes Ke's bid for statutory damages, but does not otherwise dispute any specific aspect or calculation of her Rule 58 motion (besides moving for judgment as a matter of law in the defense's favor, which the Court denies).

The Court finds judgment warranted against the liable employers in the following amounts, based on the jury's special verdict.

### 1.    Ke's Unpaid Minimum, Overtime, and Spread-of-Hours Wages

Ke's unpaid wages are calculated as follows: (regular hours worked x minimum wage) + (overtime hours worked x 1.5 x minimum wage) + (days on which the spread-of-hours exceeded 10 hours x minimum wage) – pay actually received.

The jury found that Ke was employed at JR Sushi from January 1, 2017 through July 31, 2019.  *See* Verdict at 1–2, 6 (finding such employment lasted 134 weeks, between January 2017 and August 2019).  Between January 2017 and April 30, 2018, she worked 72 hours per week. *Id.* at 2–3.  Between May 1, 2018 and July 31, 2019, she worked 79 hours per week.  *Id.* at 3. During her employment at JR Sushi, the spread-of-hours exceeded 10 hours six days per week. *See id.* at 2 (finding Ke worked 12-hour workdays, and worked six days per week through April 30, 2018, and "6.6" days per week thereafter).

The jury found that, in 2017, Ke worked 2,080 regular and 1,664 overtime hours, and 312 days on which the spread-of-hours exceeded 10; in 2018, she worked 2,080 regular and 1,906.70 overtime hours, and 312 days on which the spread-of-hours exceeded 10; and, in 2019, 1,213 regular and 1,183 overtime hours, and 182 days on which the spread-of-hours exceeded 10.  *Id.*

23

at 5.  Accordingly, in 2017, Ke was owed $22,880 for regular hours, $27,456 for overtime hours, and $3,432 in spread-of-hours wages; in 2018, she was owed $27,040 for regular hours, $37,180.65 for overtime hours, and $4,056 in spread-of-hours wages; and, in 2019, she was owed $18,195 for regular hours, $26,617.50 for overtime hours, and $2,730 in spread-of-hours wages.[11]  These figures total $169,587.15—the amount of wages Ke should have been paid by JR Sushi.

The jury found that Ke was in fact paid $59,600 total during her employment there.  Ke is thus owed $109,987.15 in unpaid minimum, overtime, and spread-of-hours wages.[12]

### 2.    Prejudgment Interest

The NYLL entitles a prevailing plaintiff to prejudgment interest on unpaid wages at 9% per annum calculated through the entry of judgment.  NYLL § 663(1); N.Y. C.P.L.R. § 5004(a).  Where "damages were incurred at various times," interest may be calculated for "all of the damages from a single reasonable intermediate date."  N.Y. C.P.L.R. § 5001(b).  In wage and hour cases, courts typically "choose the midpoint of the plaintiff's employment within the limitations period."  *Chen v. Patel*, No. 16 Civ. 1130, 2019 WL 2763836, at *14 (S.D.N.Y. July 2, 2019); *see also Pineda v. Tokana Cafe*, No. 16 Civ. 1155, 2017 WL 1194242, at *4 (S.D.N.Y. Mar. 30, 2017) (same).

Here, the entirety of Ke's employment at JR Sushi—January 1, 2017 through July 31, 2019—fell within the six-year statute of limitations, given that Ke filed this lawsuit on August 6,

---

[11] In 2017, 2018, and 2019, the minimum wage rates were $11, $13, and $15 per hour, respectively.  Dkt. 196 ("Jury Charge") at 66.

[12] This figure is $19.50 greater than the amount Ke's counsel calculated.  That discrepancy appears attributable to a typo in the Schweitzer Declaration, which states that Ke worked 1,905.70 overtime hours in 2018, whereas the jury found she worked 1,906.70 overtime hours that year.  *Compare* Schweitzer Decl. at 5, *with* Verdict at 5.

2019.  *See* NYLL §§ 198(3), 663(3).  The midpoint of her employment was April 16, 2018 and

judgment will be entered on July 1, 2026.  Applying the 9% per annum statutory rate to the

amount of her unpaid wages, Ke is entitled to $81,306.12 in prejudgment interest.

### 3.  Liquidated Damages

The NYLL also requires a prevailing plaintiff to receive liquidated damages "equal to

one hundred percent" of the unpaid wages found to be owed to the plaintiff, unless the employer

was found to have acted in good faith.  NYLL §§ 198(1-a), 663(1); *see, e.g.*, *Ortega v. 2&5 Line

Deli Grocery*, No. 22 Civ. 9170, 2025 WL 3469951, at *4 (S.D.N.Y. Dec. 3, 2025).  The jury

here found that the liable employers did not act in good faith.  Verdict 6–7.  A liquidated

damages award of $109,987.15—the amount of Ke's unpaid minimum, overtime, and spread-of-

hours wages—is thus warranted.

### 4.  Statutory Damages for Failure to Provide Wage Notices and Statements

The NYLL imposes statutory damages of $50 per work day an employee was not

provided an adequate wage notice, and $250 per work day an employee was not provided

adequate wage statements, unless the employer was found to have acted in good faith (or

establishes another affirmative defense not applicable here).  NYLL §§ 195(1)(a), 195(3), 198(1-

b), 198(1-d).  The statute caps each such award at $5,000 (*i.e.*, 100 days without adequate wage

notices, and 20 days without adequate wage statements).  To satisfy Article III's injury-in-fact

requirement, a plaintiff seeking such awards must also show that she "plausibly would have

avoided some actual harm or obtained some actual benefit" if accurate notices or statements had

been provided.  *Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300, 308–09 (2d Cir. 2024).  Lost

wages due to a defendant's failure to provide adequate notices or statements are "exactly the

types of harm" sufficient to show concrete injury.  *Sanchez v. Clipper Realty, Inc.*, No. 21

Civ. 8502, 2026 WL 496555, at *21 (S.D.N.Y. Feb. 23, 2026); *see Guthrie*, 113 F.4th at 309–10

(plaintiffs need not "demonstrate that their lack of notice resulted in an injury greater than their

employers' minimum wage, overtime, and spread-of-hours wage violations" (citation omitted)).

Here, the jury found that Ke suffered concrete, downstream harm in the form of lost

wages.[13]  She thus satisfies Article III's injury-in-fact requirement, so as to be eligible to receive

statutory damages for inadequate notice.  *See, e.g.*, *Sanchez*, 2026 WL 496555, at *21; *Moran v.*

*John J. Picone, Inc.*, No. 24 Civ. 4095, 2025 WL 2783596, at *8 (E.D.N.Y. Sept. 30, 2025).

Such damages are available here because the jury found that the liable employers did not act in

good faith.  Verdict at 6–7.  And it found that Ke was not provided adequate wage notices or

statements at any point during her 134-week employment.  *Id.* at 6.  The liable employers'

violations of the NYLL's wage notice and statement requirements thus far exceed the statutory

penalty limits (*i.e.*, of 100 days without adequate wage notices, and 20 days without adequate

wage statements).  Ke is entitled to $5,000 for not having received adequate wage notices, and

$5,000 for not having received adequate wage statements.

### 5.   Total Award

Ke is entitled to $311,280.42 total (*i.e.*, $109,987.15 in unpaid wages + $81,306.12 in

prejudgment interest + $109,987.15 in liquidated damages + $10,000 in statutory damages).

### CONCLUSION

For the above reasons, the Court denies the defense motions under Rules 50 and 59, and

grants Ke's motion under Rule 58 (with a minor arithmetic correction to the amount of her

unpaid wages).  A judgment consistent with this decision will be entered separately.  By separate

---

[13] *See also* Tr. at 49–50 (Ke testified that her first job in the United States was at JR Sushi, and
that she was unfamiliar with federal or state employment laws and practices).

26

order, the Court will set a briefing schedule for Ke's anticipated motion for attorney's fees and costs. The Clerk of Court is respectfully directed to terminate all pending motions.

SO ORDERED.

*Paul A. Engelmayer*

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: July 1, 2026
      New York, New York